Mr. Justice Wells
delivered the opinion of the Court.
This case has attracted more attention, and excited deeper interest than any other ever presented to us; and we have departed from the general rule by hearing four counsel on each side. The questions presented are numerous and complicated.
In view of the importance of the decision as affecting other transactions, as well as establishing precedents to govern us hereafter, we have examined minutely the points raised by counsel.
Primarily, two propositions are advanced. The first is: That the Bedemption Act, as it is called, does not apply to this cáse, for the reason that by the rule of construing stat *132 utes, it was intended by the law-making power that it should have a prospective, and not a retrospective effect; and for the further reason, that if it was designed to have a retrospective action, then the law is in contravention of that clause of the Constitution of the United States, which prohibits the several States from passing laws impairing the obligations of contracts,
Let us consider the first. Shall the Court, in construing-the 229th section of the Practice Act, authorizing the redemption of real estate, give to the statute a retrospective operation?
It will not be denied that, by general rule, statutes not expressly made retrospective in terms, should not [132] be' so *construed as to affect past transactions, especially -where such construction would work injustice or disturb vested rights. The reasoning of Chief Justice Bronson, in Quackenbush v. Danks, 1 Denio, 130, cannot but commend itself favorably to every fair judicial mind. He says:
“■Whatever may be thought of the expediency of passing exemption laws, if they are wholly prospective in their operation, no wrong is done to the creditor. He has the law before him when he parts with his money, or his property, and it will not be the fault of the Government if the debt is lost. But when such laws are made to act upon past transactions, they cannot fail to work injustice. They take the property, which in honesty and fair dealing belongs to the creditor, and without: his consent transfer it to the debtor. The least that can be said of such laws is, that they prove the existence of a bad state of public morals. There is nothing in the statute under consideration which, either in terms or by necessary implication, makes it applicable to the case in hand; and we ought, in decency, to conclude that the Legislature did not intend that it should have the retrospective and unjust effect which is claimed for it by the plaintiff. I will not deny that the general words in which the law is framed, are broad enough to include contracts already in existence, as well as those which should *133 afterwards be made. But it is a well established rule that a statute shall not be so construed as to give it a retrospect beyond the time of its commencement; and there are many cases in the books where general words as comprehensive as those under consideration, have been restricted in their influence so as not to reach past transactions. This is but a branch of that great principle which requires that every law should, if possible, be so interpreted and carried into effect that no wrong will be done to any one.”
To this opinion of the learned Judge, so elevated in sentiment, correct in morals, and clearly right in law, we fully subscribe.
The principle announced by him will everywhere be recognized as honest and just. His is not the only opinion that upholds this position. The books are replete with them; and upon a thorough and laborious examination of all the cases * cited, our previous convictions yield, [133] not only to the weight of authority, but to the force of reason. We but concur with the great majority of th« Judges in England and America, when we assert that it is well established not only as the doctrine of the common law, but as a principle of general jurisprudence, that no statute shall be so construed as to give it a retroactive effect; to divest the rights of individuals vested, previous to its passage, or previous to the time the Act took effect— unless such intention be expressed in terms. No argument need be adduced to demonstrate the justice of this principle; the authorities all sustain it. The books say: “ It is in the general true that no statute is to have a retrospect beyond the time of its commencement.” “ The rule and law of Parliament,” says Bracton, “is nova constitutio futuris formara debit imponere non preteritis.” Not only is this the doctrine of the English law, but it is founded on the principles of jurisprudence observed in every land. A retroactive statute would partake in its character of the mischiefs of an ex post facto law, as to all eases of crimes and penalties; and in matters relating to contracts or property would violate every sound principle. In Gilvore v. Shuter, a verbal prom *134 ise was made to give or bequeath a sum of money in consideration of marriage. ' ( See 2 of Atk. 36, and 2 Lev.) The question that arose there was, whether this promise, not being in writing, was within the 29th Car. 2, Ch. 3. The Court said, “It cannot be presumed that the statute was to have a retrospect, so as to take away a right of action which the plaintiff was entitled to before the time of its commencement.” Lord Mansfield says (4 Burr, 2460) “here is a right vested; and it is not to be imagined that the Legislature could, by general words, take it away; they certainly meant future actions.” (See also the numerous cases cited in Lwarriss on Statutes to the same point, from 539 to 547.) This doctrine rests not alone upon the English common law. It derives authority from the Ancient Homan Civil Law (see Taylor’s Civil Law, 169, and Homan Appendix), and also from the civil law of modern and enlightened France. When she was at the eminence of learning and science, the Code Napoleon adopted the rule. Indeed, long before Napoleon had risen to power, in [124] * the days of the Eepublic, when Eobespierre, Marat and their compeers controlled her destinies, before the First Consul had attained eminence or dreamed of the imperial sceptre — in the midst of bloody scenes of tumult and revolution — even then this principle was preserved by the law-making power. In the Constitution of the French Eepublic of 1795, an article will be found to the effect that no law, criminal or civil, could have a retroactive effect. “Aucwie loi, mi criminelle, ni civille, ne peut avoir d'effet retroactif. ”
Chancellor Kent employs stronger language than this, in his Commentaries, and asserts that: “Even French despotism, atrocious as it is in practice, yields in its laws to this principle; for the same limitation is laid down as a fundamental truth in the code now in force, under the sanction of the French Empire.” “En general les loisn’ont point d’effet retroactif, le principe est incontestable,” etc. Li scours Preliminaire du Premier Projet du Code Civil, Art. 2, Titre Preliminaire de la Publication Les Lois; “La loi ne dispose que pour L’avenir; elle n’a point d’effet ret/roactif.”
*135 The Princes and Emperors of Borne in the pride and plenitude of power, observed this just rule, with the exception of OaUgula, whose despotism and iniquity in withholding it, has subjected his memory to execration for all time. The criticism upon the technical term ex post facto amounts to nothing. The great leading principle which we assert applies as well to civil as to criminal cases. ( Coke’s Litt. 360; 1 Blacks, p. 45.)
But why go to the civil law o f Borne, the code of Erance, or the common law of England ? The best authorities in American jurisprudence have approved and maintained the doctrine we assert. The case of Quackenbush v. Danks, (where the opinion was delivered by one of the ablest and purest men that ever held a judicial position), is conclusive. The reasoning cannot be confuted. But out of deference to the opinion of my associates, I will examine the American authorities cited by counsel, which are relied upon to sustain the opposite doctrine to that laid down by Chief Justice Bronson, Before proceeding to this branch of the case, we will pause to consider the * suggestion that [135] the repeal of the Act of 1850 left the judgment creditor destitute of all remedies, except such as were provided by the Act of 1851. A law introducing new requisites will not avoid a contract that was valid before the law passed. Upon this point, Lord Denham stated that the Court of Queen’s Bench was of opinion ‘ ‘ that the law as it existed when the action was commenced, mu'st decide the rights of the parties in the suit, unless the Legislature expressed a clear intention to vary the relations of the litigant parties to each other.” (Hitchcock v. Way, 6 Adol. & E. 943; Surtees v. Ellison, 4 Man. & R. 586, S. C.; 9 Barn. & C. 750.)
The rule is laid down by Lord Tenterden to the same effect, in the opinion to which we have been referred. He says that “when an Act of Parliament is repealed, it must be considered the same as if it had never existed, except with reference to such parts as are saved by the repealing statute.” And the language of Lord C. J. Tindall, in 4 Moore & Payne, does not differ from the rule. No one will question the right of Parliament or the Legislature to repeal *136 statutes where subsisting rights are not disturbed, or the obligations of contracts impaired. Nor is it necessary to deny that the right to pass retrospective laws of a remedial character, rests in the Legislature. Having examined all the English and civil law authorities cited, we now proceed to the American cases, many of which would be strong against the appellants, if .correctly quoted and read. For example: In the case of Boyce v. Holmes, 2 Ala. 54, the syllabus says: “It is a rule of construction, founded on the principles of general jurisprudence, that a statute is no.t to have a retrospective effect beyond the time of its enactment.” And the reasoning of the Chief Justice is in accordance with this rule.
In Calder v. Bull, 3 Dall. 386, Mr. Justice Chase held “that every law that takes away or impairs rights vested agreeably to existing laws, is retrospective and unjust, and that it is a good general rule that a law shall have no retrospect.” The Chief Justice of Alabama proceeds to say: “The construction contended for on the part of the defendant would-make- the statute operate unjustly. It would make it defeat a suit already commenced upon a right already [136] vested. *Nothing could be more alarming than such a subversion of principle. It-is a principle of English common law, as ancient as the law itself, that a statute, even of its omnipotent Parliament, is not to have a retrospective effect. ” And he cites, to the same effect, the following cases:
Ogden v. Blackledge, 2 Cranch. 272; United States v. Fisher, 2 Id, 358; Bradelstone v. Sprague, 6 Johns. 101; Osborn v. Huger, 1 Bay, 179; People v. Tibbets, 4 Cow. 384; Bedford v. Shilling, 4 Serg. & R. 401; Ogle v. The Somerset and Mt. Pleasant T. Co., 13 Id. 25; Philips v. Gray, 1 Ala. 226; The Society, etc. v. Wheeler, 2 Gall. 105; Woart v. Winnick, 3 N. H. 473; Dow v. Norris, 4 Id. 19; Miller v. Dennett, 6 Id. 109. The case of Rathbone v. Bradford, 1 Ala. 312 does not apply.
It is not necessary for us to deny that a statute, in which *137 no time is expressed when it shall become operative, takes effect from its passage; or that it was competent for the Legislature to change the time when the Courts should be hoi den, and thus expedite or delay a remedy. The authority is inapplicable, for the reason, that in the statute we are considering, passed 29th of April, it was provided that it should not take effect until the first of July following. The same remark applies to Dale v. The Governor, in 3 Stew. 387. We do not question the correctness of the doctrine there advanced, to the effect that the Act passed was an Act of ordinary legislation, and created no obligation or contract on the part of the State, nor vested any right. We have made a similar decision in the case of the Executors of Bigelow v. The City of Sacramento, where the donation or bequest was not accepted before the repeal of the Act or ordinance; in other words, before the right became vested. We are next referred to the case of Iverson v. Shorter, 9 Ala. 713, wherein the Court says: “ It is contended the statute should be restricted to such judgments as are obtained after its enactment. There is no room to give this restriction without departing from the very letter of the law, which directs that all sales ‘henceforth made,’ shall be governed by it. In New York, these statutes are considered remedial, and as such, entitled to be construed * in [137] the most liberal manner, to advance the remedy.” ( Van Renseelaer v. Sheriff of Albany, 1 Cow. 501.) With us, statutes giving a new remedy, have frequently been construed to apply to suits then existing — (Bartlett v. Lang, 2 Ala. 404) — and such is believed to* be the general construction with respect to such statutes, unless the intention is apparent to restrict their operation. The opposite rule applies when statutes seem to affect existing rights. (Boyce v. Holmes, 2 Ibid. 54.) Upon an examination of this opinion, and the authorities cited, it will be found that the Court have relied upon the loose dicta of the Supreme Court of the State of New York as to remedial statutes.
What is a remedial statute? Blackstone says: “Remedial statutes are those which are made to supply such defects, and abridge such superfluities in the common law as arise *138 either from the general imperfection of all human laws, from change of time and circumstances, from the mistakes and unadvised determination of unlearned (or even learned) Judges, or from other cause whatsoever.” This definition will not apply either to the case before us or to that cited from 9 Ala. In the latter case, the Court adopts the dicta of Cowen, but in its final decision, abandons them, and adheres to the principle laid down in Boyce v. Holmes, 2 Ala. 54. Upon examination, wo are satisfied that the decision will sustain the view we have taken here, as to the construction to be placed upon the retroactive effect of statutes, and the repeal of them. In view of the constitutional question involved, we shall hereafter consider more fully this opinion in Iverson v. Shorter.
The next case upon which reliance is placed to sustain the counsel for appellants, is that of Rockwell v. Hubbell, 2 Doug. Mich. 197. Eeluetant as we are to question the opinion of the Supreme Court of another State, of equal powers, we are unwilling to believe that any intelligent counsel will seriously assert that the principle upon which that case turned, is sound in law, or applicable to the case now under consideration. The Court, in the case cited, deferentially doubts the correctness of the judgment of the U. S. Supreme Court. We, with equal deference, [138] prefer to yield our opinions to the last * named tribunal, as being safer than following the course of the learned Judges of Michigan. 2 Hill, 380, is cited. In that case, Cowen, J. says: “It is a general rule that a statute affecting rights and liabilities should not be so construed as to act upon those already existing. To give it that effect, the statute should declare in terms, an intention so to act.” We are referred also to The People v. Herkimer Common Pleas, 4 Wend. 210. The case does not apply.
The Court, Marey, J. says: £ £ That the statutes there in question take up the proceedings in causes pending where they find them; and where the statútes under which proceedings were commenced are repealed,” the subsequent proceedings must be regulated by the Eevised Statutes. Here, it will be seen, that the question was as to costs of *139 suit, and not as to contracts or any vested right, and differs from the one before us in this: that the statute takes up the proceedings in causes pending where they find them, and does not contain a saving clause for the protection of proceedings already commenced; besides the opinion of Justice Marcy has since been several times overruled by higher tribunals. The People v. Livingston, 6 Wend. 526 (another case cited as authority by the appellants) does not sustain their position. The Court says: That it cannot be denied that the Legislature possesses the power to take away by statute what was given by statute, except vested rights; and the distinction is drawn between the repealing Act of 1813, and the Act of 1828, upon the latter of which both these decisions depend. The latter cases are revised in Wadsworth v. Thomas, 8 Barb. 445, in which it was conceded that in this case, with others cited, the statute should be construed to act prospectively, and not retrospectively. But why multiply the citations ? The authorities all agree, at least all those that are reliable, upon the general principle we assert. The principle needs no law writer to vindicate it. It is too strongly founded in reason to be disturbed by any assault that subtlery, sophistry, or criticism can make. The presumption is, that the Legislature did not intend to pass any law that would affect past transactions, or work injustice; and such is the construction that must be given to this law. * Again: [139] the act was not only not retrospective in terms, but is expressly prospective, and limited to suits commenced after it took effect. The statute we are considering, was passed on the 29th of April, 1851, but by its terms did not take effect until July following, and then, by a saving clause, provided that the repeal of the old statute should not invalidate any judgment or order made, or any proceeding already taken by virtue of the former statute.
It is contended that the proposition as to retrospective operations of statutes depends upon the constitutional question, and that they must stand or fall together; that the last supports the first, and that the only objection to a retrospective law is, that it impairs the obligations of contracts.
*140 "We think there is a broad difference in the two propositions, and being satisfied that our conclusions are correct in regard to the first, we proceed to the second, involving the constitutionality of the law.
The suit on which judgment was obtained, and under which the respondents purchased, was commenced, and proceedings taken therein, before the statute providing for redemption took effect. It therefore came clearly within the rule by the express words of the statute, and the right for an absolute sale became vested. The conclusion at which we have arrived is, that the repeal of the former statute was not intended to operate upon cases pending, rights vested, or proceedings commenced before the Act took effect. Such repeal could not, nor was it intended to affect the rights of parties. It is alleged that the intention was to repeal the former statute altogether. To do so would have been to strip the creditor of all remedies. The fairer presumption is indicated by the saving clause. It applies only to cases in futuro.
We would rest here, but that arguments have been urged most strenuously upon the constitutional point. Upon that branch of the subject we are relieved from whatever doubt we may have entertained, not only by our own deliberative consideration of the subject, and the impregnable position of the U. S. Supreme Court, in Bronson v. Kinzie, in 1 How., but by the confirmation of the doctrine by the same high tribunal, in McCracken v. Hayward, 2 How., upon full review.
[140] * Decisions of Courts should be such as to secure quiet and repose, and not engender a spirit of litigation, or waste property and time in a lingering act. They should be uniform and consistent. We cannot say that the law is unconstitutional, when the amount involved is small, and constitutional, when it is large and works a hardship or affects the public welfare. The Supreme Court of the United States has decided this question in one case, and confirmed it in another. Some of the new States have, however, persisted in times of depression, when pecuniary distress became general, in the endeavor to avoid the obli *141 gations of contracts, by delaying the creditor through redemption, exemption and limitation laws, ■ and the Courts of those States have endeavored to sustain them, but in no ease, that I find, by sound reasoning. The radical spirit infused into the minds of men in hours of trouble, which in years past influenced to some extent legislative power in different States, has been stayed, by the firmness of the highest Court in the Union. The distinction attempted to be made between the obligation and the remedy, is against the principle held in the cases cited. (Sturges v. Crowninshield, 4 Wheat. 122; Evans v. Montgomery, 4 Watts & S. 220, etc. etc.) In those cases the view presented is, that there might be alterations of the remedy, providing they did not seriously impair it. “ Such an admission,” says Chancellor Kent, £ £ is dangerous from its liability to misconstruction and abuse.” Alterations, although going to the former proceeding only, may practically destroy the obligation, by stripping the creditor of all effective means of enforcing it. He contracts in good faith under the existing laws; both parties are presumed to understand them, and the creditor relies upon their efficacy for his protection. Suppose the Legislature, before the debt arising from such contract became due, should abolish all laws for the collection of debts, and that such abolition should, by the language of the statute, or the interpretation of the Court, be construed to affect past transactions, would not the obligation of the contract be impaired? To burden the remedy with new restrictions, to make it useless, or hardly worth pursuing, is as much a violation of the Constitution as to deny all remedies. Had * the judgment creditor in this [141] case any rights affected by the application, of the redemption law to his contract ? It will not be denied that at the time of the contract his right was absolute, (and therefore vested), in the language of the Supreme Court of the United States, “to sue,..recover judgment, take out execution, and sell absolutely.” By the change of the law, the right of absolute sale is taken away, and a provision substituted, which not only hinders and delays him in recovering his money, but renders him insecure in the hope of it, and *142 might in many instances totally destroy his rights by nullifying them. It is said that a substantial remedy is left; but if the Legislature can delay payment by limitation or exemption laws for six months, they may do it for six years: Hence the cautious apprehensions of the sages of the law, who tell us that such a construction would be pregnant with mischief, and liable to abuse. The highest authorities among American jurists, and the most learned expounders of the Federal Constitution, concur in the rule, that the suspension, by statute, of remedies, or any part thereof existing when the contract was made, is more or less impairing the obligation of the contract. It is said that the authorities only apply to those cases where the remedy is denied. Such is not the language of the Constitution — it says impaired. There is very little distinction between the cases of Bronson v. Kinzie and the one at the Bar. No redemption law existed in either case at the time the contract sued upon was made; in both cases the law was passed subsequent to the making of the contract, and before final judgment. The decision of the Federal Court is therefore applicable to this case. From the decision in 2 How., affirming that in the first of the same work, it is said Judge Catron dissented. Upon examination it will be found that the assertion is erroneous. The decision of the Court was unanimous, and the learned Judge named agrees with his brethren on the Bench, and upholds the doctrine here advanced. He hesitates only upon those laws in other States, wherein “no distinction is made between contracts made before the passing of the Act, and those made afterwards;” evidently pausing at the threshhold of the question we have heretofore discussed, as to retroactive laws, and apprehending [142] with Chancellor Kent that a decision upon * that point might be misconstrued and lead to abuse. This opinion of Judge Catron is in accordance with our own. Mr. Justice Story, delivering the unanimous opinion of the Court upon the first hearing, says: £ £ It is no answer that the Acts of Kentucky now in question are regulations of the remedy, and not of the right to lands. If those Acts •so change the nature and extent of existing remedies as materially to impair the interest and rights of the owner, they are just as much a violation of the compact as if they had overturned his rights and interests. ” (See Green v. Biddle, 8 Wheat.) The question there arose under the seventh article of the compact made between Yirginia and Kentucky upon the separation of the latter from the former State, and depended upon two several Acts passed in 1797 and 1812, by the Legislature of Kentucky. These Acts were held by the Supreme Court upon two hearings in the opinion we have cited, to be unconstitutional and void, as impairing the obligation of the compact between Yirginia and Kentucky. Story in his Commentaries sustains the opinion he delivered on the Bench. (See § 1398.)
The proposition already asserted is presented in a different light from the one we have just examined, but illustrates the principle that the property of the debtor, or any part thereof, cannot be.substracted from the creditor’s claim, or divest his. lien thereon, and be appropriated to the benefit of the debtor. This agrees fully with the rule laid down in Quackenbush v. Danks. The creditor whose contract is made under an existing statute, should not be deprived of his rights by the paralyzation of his remedy. It would not be honest, just or correct, either in ethics or in law.
Assured that we can safely depend upon the decisions of the U. S. Supreme Court, which concur with our own, we leave this branch of the question.
But conceding, for the sake of argument, that the law was to have a retrospective effect, and also that it was constitutional — Was the redemption legally perfected? In the solution of this problem, we must consider several questions made at bar:
I. Was it made in time ?
II. By the proper parties?
III. In a legal manner?
*143 [143] *First — As to the question of time. Although urged by counsel, the case will turn upon points of more moment and consequence, and we dismiss it with the view of examining the others. To enable us to do this, we must refer to the statute we are to construe, and the findings of the Court as to the facts.
“Section 229. (See Civil Practice Act.) Upon a sale of real property, when the estate is less than a leasehold of two years unexpired term, the sale shall be absolute. In all other cases, the real property shall be subject to redemption, as provided in this chapter. The officer • shall give to the purchaser a certificate of the sale, containing—
1st. A particular description of the real property sold.
2d. The price bid for each distinct lot or parcel.
3d. The whole price paid.
4th. When subject to redemption it shall be so stated, a duplicate of which certificate shall be filed by the officer with the Recorder of the County.
“Section 230, Property sold, subject to redemption, as .provided in the last section,, or any part sold separately, may be redeemed in the manner hereinafter provided, by the following persons or their successors in interest:
1st. The judgment debtor, or his successor in interest, in the whole or any part of the property.
2d. A creditor having a lien by judgment or mortgage on the property sold, or on some share or part thereof, subsequent to that on which the property was sold. The persons mentioned in the second subdivision of this section are in this chapter termed redemptioners.
“Section 231. The judgment debtor ora redemptioner may redeem the property from the purchaser within six months after the sale, on paying the purchaser the amount of his purchase, with eighteen per cent thereon additional, together with the amount of any assessments or taxes which the purchaser may have paid thereon after the purchase, and interest on such amount; and if the purchaser be also a creditor, having a lien prior to that of the redemptioner, the amount of such lien with interest.
*144 Section 233. The payment mentioned in the [144] last two sections may be made to the purchaser or redemptioner, as the case may be, or for him, to the officer who made the sale; and a tender of the money shall be equivalent to payment.”
The following are all the findings that are necessary to consider at this point of the case:
5th. That on the 29th day of July, 1852, Stephen B. Harris, then the Mayor of the City of San Francisco, and P. A. Morse and B. C. Sanders, two of the Commissioners of the Funded Debt of the City of San Francisco, all being citizens and tax-payers in said city, did attend before the said Sheriff, at his office in said city, and did then and there, for the purpose of redeeming .the said property purchased by the relators and certain other property sold to other persons at the same sale, deliver to him one certified check for the sum of $17,969, being an amount equal to, or exceeding the sum paid by the said relators and others, to the said Sheriff, for the property so sold at the aforesaid sale or sales thereof, together with eighteen per cent added thereto, and the further sum of $500, in one check, to cover any taxes or assessments which the purchasers might have paid, with direction to the Sheriff, and promise by him, to ascertain and pay out of said sum to each of said relators, as well as other persons who might thereto be entitled, the full sum of money to which each of said relators and others should be found entitled, by the amount of purchase money which each respectively had paid in to said Sheriff, in virtue of said sale or sales, with eighteen per cent interest thereon.
6th. That Stephen B. Harris, Mayor, etc. and P. A. Morse and B. C. Sanders, Commissioners of the Funded Debt, etc., at the time last mentioned, claimed to act for and in behalf of the City of San Francisco, and claimed and intended to redeem said lands for and in behalf of the City of San Francisco,
7th. That the said Sheriff did receive the said checks, and *145 after ascertaining that his bankers would take them as so much money, did accept and receipt for the same, as for so much cash to him paid, and that said checks were after-wards, on the same day, deposited by said Sheriff [145] with his said bankers, who, * on the nest day, July 30th, 1852, collected the said cheeks and received the cash for the same; and that the said sum in money, or so much thereof as has not been received by any of the purchasers at said rate, is now on deposit with said Sheriff’s bankers, and ready to be paid to the relators as they may be thereto respectively entitled, and that no part thereof has been at any time received by the relators, or any of them; but they, and each of them, have at all times 'refused to accept the same, or any part thereof.
8th. That the said Stephen R. Harris, Mayor of the City, and the said Morse and Sanders, did not appear before the said Sheriff, or do any act to effect a redemption of the said property, in virtue of any ordinance, direction or resolution of the Common Council of the said City of San Francisco.
9th. That the Common Council of said City of San Francisco has not passed or adopted any act, or ordinance, or resolution, ■ directing, authorizing, approving, or adopting the act or acts of the aforesaid persons, who undertook to redeem the said property as aforesaid, or either or any of them, and that no redemption of the said property has been undertaken or effected under the direction or by any authority of the Common Council of the said City of San Francisco, or with its approval or sanction at any time since the said 29th day of July, 1852; that Stephen R. Harris, Mayor of the City of San Francisco, and Messrs. Morse and Sanders, Commissioners, etc., were not, nor were any or either of them, by virtue of their offices or otherwise, authorized to redeem the lands in question.
1. As to the parties. The Court below finds, that no legal or valid redemption has been effected; that Stephen R. Harris, Mayor of the City of San Francisco, and Messrs. Morse and Sanders, Commissioners, etc., were not, nor were any or either of them, by virtue of their offices or otherwise, authorized to redeem the lands in question.
*146 It is said that the act of the Mayor -was the act of the city. This proposition cannot be sustained.
The powers and duties of the Mayor are defined by the charter; but it is asserted that the act of redemption was properly * the duty of the Mayor, as chief [146] executive officer; in other words, it was an executive and not a legislative act.
What is an executive officer ?
He is one in whom resides the power to execute the laws. It will not be pretended that his Honor, the Mayor, undertook to execute any law in making the pretended redemption. The record shows, and the finding is, that no such law was passed. The answer is decisive. The Mayor could not legislate! If he could, so also could the City Treasurer, the Street Commissioner, or the Collector of Taxes. They are all executive officers as well as ministerial. By way of illustration, let us consider how this would operate. Suppose the Treasurer should take twenty thousand dollars of the public money and purchase a lot upon his own volition, under the hallucination that it would benefit the corporation; or that the Tax Collector, thinking that a piece of property was about to be sacrificed, should apply funds collected for taxes to a like purpose; or that the Street Commissioner, under the impression that it would benefit the corporation, should undertake to open and grade streets at his own option ? We need not go farther than to present the propositions, to show their absurdity. These are all executive officers; and if it be true that the Mayor has the right to buy, sell or redeem, the others have the right also. It is clear that they and the Mayor had no right to redeem, and the finding of the Court below is correct.
The Common Council refused to give him or anybody else such authority. Acting in their legislative capacity, they declined the redemption; reposing doubtless upon the legal advice they had summoned to their aid; believing that the transfer of the city’s interest to the Commissioners of the Sinking' Fund was valid, and that the sale was of no avail, therefore resolved that they would not expend for redemption the sum named, and the costs and expenses with the *147 taxes and assessments; considering that the interests of the city were not involved in the question mooted. But it is urged that, being .for the interest of the city, it was the duty of the Mayor to redeem. We have nothing to substantiate this assertion. Hdw can we decide as to the interest of the city ? That was a decision for the [147] legislative department of the City Government, *and many substantial reasons are presented to maintain the position assumed, which was contrary to that asserted by counsel. It is said that this property is worth millions of dollars. This fact does not appear upon record, and if it did, it could have no effect upon the decision of this Court upon the constitutionality of a law, or the construction of statutes. Suppose the property was not worth one thousand dollars, and that, through connivance, or in any other way, it should be sold for fifty thousand, will any one assert that the Mayor could come forward with the public money and redeem at that price? Could he thus use the public money? No warrants were drawn by the Comptroller upon the Treasury; none authorized by law or ordinance, and none of the city’s moneys paid. Then was the act authorized by the corporation? Certainly not. An aggregate corporation cannot contract without vote, and in no other way can a corporate body express consent. (Maxwell v. Dulwhich College, 4 L. J., N. S., Ch. 131; Essex Turnpike Co. v. Collins, 8 Mass. 298, 299.) An agent acting for a corporation must do so by vote, otherwise his agency is void. (Angel & Ames on Corporations, p. 232; and cases cited and note 4, Mass. Reports.)
No vote was proven; on the contrary, the corporation refused to approve the act, and so the Court found. It is said that a ratification supplies the want of previous authority, and we are referred to the maxim: “ Omnis ratihabitio retrotrahitur et mandato equi paratur.” The law and the logic is almost as bad as the-Latin. Every ratification has a retrospective operation, and is equivalent to a previous demand. (Coke on Lit. 207, 208.) This principle has oftent times been applied and adopted by the best jurists of the country, in defining the law of principal and agent. Bu- *148 the point is this: Was the act ratified by the corporation ? No evidence was adduced to prove it, and the verdict is that it was not. It is insisted that the District Attornéy, in his plea, ratified it. He had no authority to do so. He could not ratify an act which the Council declined; and we must enumerate him with those other municipal officers whom we have already declared were unauthorized to exercise legislative powers.
* The next inquiry is — Did the Commissioners of [148] the Funded Debt redeem ? This involves the question already viewed, as to the right of one or two members to act without the approbation of the Board, and which is disposed of by the authorities cited from Angel & Ames on Corporations.
They had no authority. Neither did they act as Commissioners of the Funded Debt. From the record, it appears they claimed to redeem for the city, and not for the Commissioners of the Funded Debt.
The statute devoted all moneys coming into their hands to the extinguishment of the Funded Debt. They could not employ the funds consecrated to this honest purpose to redeem, purchase or speculate in city property. Such use of the public money was in violation of law.
Were they successors in interest? No! First, because this Court has already decided in Smith v. Morse, 3 Cal. 524, that the. transfer to the Commissioners of the Sinking Fund was illegal, under the Statute of Frauds, which prohibits the fraudulent assignment of property to hinder or delay creditors, and for the further reason, that the Act establishing the Commissioners of the Funded Debt has never been consummated.
. Neither the corporation nor the Commissioners of the Sinking Fund have ever transferred the right or title to the property in question to the Commissioners of the Funded Debt.
They were not successors in interest, judgment debtors, or judgment creditors, and therefore were not redemptioners; yet they presumed to act in the several characters, as Mayor, Commissioners of the Funded Debt, tax-payers and *149 citizens. The Court was consequently correct in saying that they bad no authority so to act. For example, look at the position of Mr. Sanders. It is very questionable whether he could hold the office of Commissioner under our laws. The Court may take judicial cognizance of the appointment of Federal officers, and it was well known that he at the period named was the Collector of the port of San Francisco. Article 4, section 21, of the Constitution of California, declares, “that no person holding any lucrative office under the United States, or any other power, shall be eligible to any civil office of profit under this [149] * State.” It being a reasonable presumption that the office he held was lucrative, he was inelligible to the office he pretended to hold.
It is said that it is not an office; but the law itself declares it to bé an office. It provides: “Section 1. That the Commissioners shall hold their offices during good behavior;” it provides for vacancies in such office, and further declares, “that before entering upon the duties of their office, they shall file a joint and several bond for the prompt and faithful .discharge of all the duties of their office.” Clearly, then, these Commissioners were officers, and not merely trustees; and, under the 21st section of the Constitution, Mr. Sanders could not hold such office, and his act was a nullity.
In answer to this suggestion, it is urged that his act was good, as an officer de facto; but the general rule and the well known maxim cannot be relied upon, for the reason that here the question as to his right to hold office is directly involved, and it is very doubtful whether the recognized maxim and rule of the common law apply where a positive constitutional prohibition exists.
Again, as to his pretended act as tax-payer and citizen: By section 230 of Act 1851, a judgment debtor may redeem, and we are referred to the 4th section of Pennsylvania Act of March, 1851, Purdon’s Digest, 324. Under this last Act, it was held that any right in law or equity, however slight, anything which can be deemed an estate, gives the right to redeem. (Dubois v. Hepburn, 10 Pet. 1; Patterson v. Brin *150 dle, 9 Watts, 98.) Upon these authorities it is insisted that the tax-payers are the real parties in interest; that they are the cestui que tnists, and judgment debtors in point of fact; that the city is a mere idea.
Two answers to this proposition suggest themselves at once to our minds: First, That tax-payers cannot be deemed trustees for the city; neither are they judgment debtors in point of law, or indeed of fact.
It is said that the Commissioners of the Funded Debt are the holders of the legal title. If so, the taxpayers had no such * estate as would give them the [150] right to redeem. They certainly were not judgment debtors, judgment creditors, or redemptioners, under the Act of April 29th, 1851.
We will not question the correctness of the decision in Patterson v. Brindle, 9 Watts, 98, but that, it will be seen, was upon a statute of Pennsylvania, differing materially from our own.
We cannot assent to the position taken, that tax-payers and citizens are judgment debtors, and thus subject the property of every citizen to the payment of the city’s debts.
The case in Connecticut shows the injustice of such á •decision. There a party obtained judgment against the county, proceeded to sell the house and lot of a private citizen for a public debt. The injustice of this was so manifest, that the opinion was reversed upon review. A similar case will be found in Massachusetts Eeports.
To declare that the property of private citizens is liable to the payment of the public debt, because they are taxpayers, would subject the property of every and any citizen to the obligations of the corporation, and to the payment of the city’s debts.
It is suggested that the appellants, Harris, Morse and Sanders, redeemed as individuals, as a munificent bequest to the city. Without questioning the generous and liberal character of the parties as public benefactors, or doubting that they intended to pay the amount of the judgment out of their own purses, from pure love and affection for Peter *151 Smith, or the corporation, we cannot see how this avails them.
We have already seen that they were not redemptioners; either as judgment debtors, judgment creditors or successors in interest.
If they purchased as individuals, to whom would the property belong ? To them ? It must belong to them, else they could not indulge their munificence. The title was with them, or they could not bequeath it to another. An analyzation of the question discussed, disperses all the shadows hanging about them, and elucidates the great principles of equity and justice which govern the case. [151] *As to tender or payment: The complaint sets forth that the appellants undertook to redeem the said property, and for that purpose did induce a certain firm of auctioneers in said city, upon the understanding that they should thereafter have the selling of the property as auctioneers, etc., to advance the money to use for such pretended exemption; or did borrow the same upon their private written agreement to pay, or see the same repaid, and no denial to this averment in the complaint appears in the answer. Therefore, it must be taken as confessed to be true.
Such pretended payment was made by delivering private checks of such individuals to the Sheriff. This was no payment under our laws. The Constitution forbids it.
This is emphatically a hard money State. In Section 31, Article IV, it is declared that no association shall make, issue, of put in circulation any bill, check, ticket, certificate or other paper, or the paper of any bank to circulate as money; and Section 35 prohibits by law any person or persons, association, company or corporation from exercising the privileges of banking, or creating paper to circulate as money.
Apply this to the question before us. In the answer it is alleged that the payment for redemption was made in the constitutional coin of the United States.
WTe cannot assent to the proposition that the private checks of the auctioneers upon Sanders, the appellant, *152 although certified by him as being good, were coin, within, the contemplation of the Constitution of the United States or our own.
We are referred to cases in New York to show that a tender of bank bills is a good tender. Such have been the decisions in cases where it appeared that no objection was made to such tender, for the reason that the party was deemed to have waived his right to specie payment. But it must be remembered that in that State all bills issued are under the general banking law, secured by State stocks, and the faith and credit of the State are pledged for their redemption. Even there, the righteousness and soundness pf the decisions quoted have been much questioned.
Look for a moment at the position of Mr. Sanders — holding a Federal office, also assuming to be an officer under our State * Government. Upon the [152] inducement of certain auctioneers, he ventures forth to legislate for the city, and redeem property as a Commissioner, tax-payer and citizen.
The checks of the auctioneers and other individuals he causes to be presented at his own counter, and he certifies them to be good.
His certificate, indorsed on the checks of private persons drawn on himself, was not coin, nor was it a payment. We are met with the reply, that the Sheriff accepted them as payment; and he was responsible upon his bonds. But the parties were not to look to the Sheriff’s bonds for their security. It might so happen in some cases in different parts of the State that the Sheriff’s bond would not be sufficient security; his bondsmen might be irresponsible, or he prove a defaulter. It would be very unsafe to pronounce, that when a purchaser has paid his cash for property at Sheriff’s sale, it can be redeemed in six months, and the buyer left to look to the Sheriff’s bondsmen to get his money back.
The relators were not bound to take checks of private individuals, or indeed, of the Sheriff, as cash.
Again: How could the Sheriff decide as to taxes and assessments? He has no judicial authority, and could not *153 determine as to whom the certified checks should be given, or how distributed.
In the case of Smith, the property was sold under proceedings commenced before the law passed. At the same time other property was sold under judgments of Oarr, obtained subsequent to the passage of the Act.
Who can decide as to the right of purchasers under such sale? Or which should be subject to redemption and which not?
It is contended that the sale was announced by the Sheriff at the time to be subject to redemption; this announcement avails not. He could not change the laws, and we have already decided that the right was vested in accordance with the decisions of the United States Supreme Court, and the party plaintiff was entitled to sell absolutely. The Sheriff ’can neither change laws or conditions, or impose restrictions. The property was sold subject to the [153] laws affecting the right of the *judgment creditor, and to all those rights the purchaser became entitled.
Another argument advanced is, that the relators, not being parties privy to the contract, cannot set up objections as to the constitutionality of the law, or the mode of redemption. This will not suffice. The presumption is that they knew the law, and knowing it were aware that the sale was absolute; this may have induced them to purchase. Had they believed the property subject to redemption, they probably would not have purchased at all; it would be a dangerous rule to allow the Sheriff to sell property on execution subject to such restrictions and conditions as he should deem proper to impose. It might work great injustice in many cases.
It appears from the record that taxes and assessments were due upon the property in question.
The Sheriff could not adjudicate as to the sum due from each purchaser. In one part of the town a new street may have been opened, graded and planked; be who bought su,ch property would be assessed to a considerable amount, while another, purchasing lots upon the water beach, would *154 probably escape assessment altogether. The Sheriff could not thus exceed the bounds of his official duties.
From the considerations thus fully expressed, after an examination of all the authorities cited, we have arrived at the conclusion:
First, That it was not intended by the Legislature that the statute should have retroactive effect, or affect past transactions; but that it was intended to operate in futuro.
Second, That if such was the design of the Legislature, then the Act was unconstitutional, as impairing the obligations of contracts, and therefore void.
Third, That the redemption was not legally made. Because—
I. The Mayor had no authority, acting as an executive officer. '
II. The corporation never ratified his pretended act.
III. The City Attorney could not ratify it by plea, after suit brought.
IY. The Commissioners of the Funded Debt did not, either by a majority or a vote, attempt to redeem. They could only act by vote. Their act was, therefore a nullity.
*Y. The appellant Sanders was constitutionally [154] ineligible to hold the office of Commissioner of the Funded Debt, being a Federal officer, and therefore his act was void.
YI. No payment or legal tender was made, for reasons above assigned.
We must, therefore, in view of the whole case, having maturely considered every point suggested, approve of the finding of the Court below.
The judgment is affirmed, and it is ordered that a peremptory mandamus issue, commanding the Sheriff to make the deeds in compliance with the prayer of the complaint.