PEOPLE *v.* SALSBURY.

1. GRAND JURIES—INDICTMENT—IRREGULARITIES—ERROR.
   As 3 Comp. Laws, §§ 11881, 11882, provide that no challenge to the array or to any member of the grand jury, except that he is the prosecutor or complainant in the charge against the accused, shall be allowed, no other objections to an indictment, based on irregularities in the summoning or the proceedings of the grand jury, will be considered on error to review the conviction of the accused.

2. CRIMINAL LAW—BRIBERY—CITY ATTORNEY.
   A city attorney is an executive or a judicial officer, within the meaning of 3 Comp. Laws, § 11312, providing for the punishment of executive, legislative, or judicial officers who receive bribes.

3. SAME—INDICTMENT—ALLEGATION OF OFFICE.
   An indictment for bribery against a city attorney, if erroneous in alleging that he was a judicial instead of an executive officer, is corrected by the statement of his office and act.

4. SAME—BRIBERY OF WITNESS DURING TRIAL—SUSPENSION OF TRIAL.
   Where, during the progress of a criminal prosecution, the court was informed that an effort had been made to bribe the people's witnesses, it was not error to temporarily suspend the trial to investigate the charge of bribery.

| 134 | 537 |
| p136 | 319 |
| 134 | 537 |
| p137 | 693 |
| j137 | 703 |
| j137 | 708 |

5. SAME—MISCONDUCT OF JURY—PRESUMPTIONS.

Where on a criminal trial, during an investigation of charges of bribing witnesses, the jury were taken from the court-room, but for a time were not under the charge of an officer, the court will not presume that the jury heard the matter discussed, and were influenced to the prejudice of respondent.

6. SAME—EVIDENCE—SUBORNATION OF PERJURY.

Evidence that a respondent in a criminal prosecution has attempted to suppress testimony or induce perjury is admissible, and tends to show guilt.

7. SAME.

That a respondent was the instigator of an attempted subornation of perjury may be shown by circumstances, and it is not necessary that the circumstances should be such as to exclude a reasonable doubt that he was the instigator before admitting the testimony of the attempted subornation.

8. SAME—INDICTMENT—BRIBERY—VARIANCE.

In a prosecution for bribery, it is not necessary that the sum alleged in the indictment under a *videlicet* be adhered to in the proof.

9. SAME—CITY ATTORNEY—DUTIES AND POWERS—OPINIONS.

In a prosecution against a city attorney for receiving a bribe for giving his opinion in favor of the city entering into a certain contract, it was *held* that the giving of such an opinion was within the line of his duties and powers, and might have been done orally.

10. SAME—EVIDENCE—ACTS OF CONSPIRATORS.

Acts and declarations of conspirators in furtherance of the common design are admissible in evidence against each of them.

11. SAME—WITNESSES—EXAMINATION—NOTES OF TESTIMONY.

Where the prosecutor, in the examination of witnesses, made use of notes of testimony taken before the grand jury, it was not error to refuse to show them to counsel for the defense, or the witness being examined.

12. SAME—REFRESHING RECOLLECTION.

A witness who uses stenographic notes of the proceedings had before the grand jury to refresh his recollection as to the testimony of a witness will not be compelled, on cross-examination, to read all of the testimony of the witness, though counsel has the right to see the notes and cross-examine from them.

Exceptions before judgment from superior court of Grand Rapids; Wolcott, J., presiding. Submitted February 6, 1903. (Docket No. 200.) Decided October 27, 1903.

Lant K. Salsbury was convicted of bribery. Affirmed.

*Grove & McDonald* (*Allen B. Morse* and *William F. McKnight*, of counsel), for appellant.

*William B. Brown*, Prosecuting Attorney, and *Charles E. Ward*, Assistant Prosecuting Attorney (*Wesley W. Hyde*, of counsel), for the people.

HOOKER, C. J. The defendant was city attorney of the city of Grand Rapids, and was convicted of the offense of receiving a bribe from parties desirous of erecting a plant to supply the city with water, "under an agreement that he should give his opinion and judgment in favor of the city entering into a contract with some person, firm, or corporation, under which contract said city should pay for water, to be conveyed from Lake Michigan."

The record is voluminous, and the assignments of error are many. We will not, therefore, attempt a general preliminary statement of fact that shall cover all questions raised, thinking it more convenient to state necessary facts in connection with the respective questions discussed. These questions will be taken up in the following order:

1. The validity of the indictment.
2. The effect of the proceedings relating to the alleged attempt to bribe a witness during the trial.
3. Failure to prove the charge.
4. Errors alleged upon the charge.
5. Questions arising upon rulings relating to the introduction of evidence, and the remarks of counsel.

### 1. The Indictment.

(*a*) Contrary to the usual practice, which is to proceed by information, these proceedings rest upon an indictment found by a grand jury sitting in the circuit court for the

county of Kent. The law provides for two judges in this circuit. It does not provide for two separate and distinct courts. It has one clerk, and all cases within the jurisdiction of the circuit court are commenced and tried there, except as the superior court jurisdiction affects such question. The law provides for a presiding judge, and that one judge may constitute a quorum. This grand jury was drawn under an order made when both judges were sitting, and counsel's first contention is that the law gives no authority for two judges to act, and, although it contemplates that each judge shall have full authority to perform any official act, he cannot share the responsibility with his associate. See 1 Comp. Laws, § 285. It is said that the presiding judge might have determined the question of a necessity for a grand jury, or might have referred the matter to his associate.

(b) Upon the return of the venire, Judge Wolcott, who was sitting at the time, excused two jurors,—one because he was a nonresident of the county, and one for the reason that he had not been served personally with the venire. He then directed the sheriff to fill the panel from the bystanders by summoning two men having the requisite qualifications. The sheriff called two men from among the bystanders, and they were sworn without being examined as to their qualifications, and acted as members of such jury.

3 Comp. Laws, § 11875, provides:

"Any court in which a grand jury may be sitting may discharge any of the grand jurors for intoxication or other gross misconduct; and in case of such discharge, or in case of the sickness, death, or nonattendance of any grand juror after he shall have been sworn, the court may cause another juror to be summoned from among the bystanders, or inhabitants of the city, township, or village, having the qualifications required by law, and to be sworn and serve in his stead."

Section 342, 1 Comp. Laws, is as follows:

"In case the officers whose duty it is under this act to make and return lists of petit jurors fail to meet, make or

return said lists at the time and in the manner prescribed by this act, or in case said lists shall become exhausted, or in case said lists shall for any reason be declared illegal before the year for which they were made shall have expired, it shall be lawful for the circuit judge of any circuit court in this State to direct said officers to forthwith meet, make and return to the county clerk new lists of jurors for the remainder of the year, from which lists so made and returned jurors shall be drawn for the balance of the year. And whenever, for any cause, grand or petit jurors shall not have been drawn and summoned to attend any circuit court, or a sufficient number of qualified jurors shall fail to appear, such court may, in its discretion, order a sufficient number of grand or petit jurors, or both, to be forthwith drawn and summoned to attend said court: *Provided,* that, in drawing jurors under this section, the court may, for the purpose of obtaining a jury or talesmen near the county seat, direct from which township or supervisor districts such jurors shall be drawn."

Counsel insist that the action of the court was erroneous, and that these two men were summoned without authority of law. They say that the only lawful method was to have drawn from the list, and that, in any event, the persons drawn should have had the qualifications prescribed by law, which counsel sought to show, under their plea, these had not.

These questions were raised by pleas, in which counsel set up the facts relied upon. There were seven of these pleas, the first of which questioned the validity of the order impaneling the grand jury for the reason above stated. The second related to the filling of the panel as above described. The third charged that one of said talesmen was summoned collusively at the instigation of the prosecuting attorney. The fourth asserted that the prosecuting attorney or his assistant unlawfully consulted with and advised members of the jury. The fifth stated that the assistant prosecuting attorney appeared before and made an argument to the jury after the evidence was taken, and participated in the deliberations, contrary to law (see section 11890, 3 Comp. Laws). The sixth alleged that the defendant was not held to answer an indictment on the

presentment of a grand jury lawfully drawn, and that the jury conducted its proceedings and deliberations in violation of article 5 of the amendments to the Federal Constitution. This appears to have been based upon all of the alleged irregularities before mentioned, as well as other alleged misconduct of the jurors and prosecuting officers. The seventh plea alleged collusion between the prosecuting officers and one of the jurors. Issue was joined and tried upon the third and seventh pleas, and a verdict directed for the people. Counsel claim the question should not have been taken from the jury. Demurrers to the other pleas were sustained, and this is said to be error.

A full and complete answer to all of these attacks is found in the statute, sections 11881, 11882, which provide:

"(11881.) A person held to answer to any criminal charge may object to the competency of any one summoned to serve as a grand juror on the ground that he is the prosecutor or complainant upon any charge against such person; and, if such objection be established, the person so summoned shall be set aside.

"(11882.) No challenge to the array of grand jurors, or to any person summoned as a grand juror, shall be allowed in any other case than that specified in the preceding section."

This indictment was found by a tribunal having the semblance and exercising the functions of a grand jury, in a court of general jurisdiction. It was selected and organized under the forms of law, and was a *de facto* grand jury, acting under the control and direction of such court. The questions raised go to the presentment merely, and, as was held in *People* v. *Reigel*, 120 Mich. 78 (78 N. W. 1017), and cases there cited, the statute precludes the successful raising of these questions. An attempt is made to distinguish this case from others, especially the *Reigel Case;* and it is urged that "it was not meant to be said by the court that our statute prohibits a respondent from raising these objections;" and certain language is quoted from the opinion in that case, which is supposed to indicate that one is not without remedy for such irregularities.

Much was said in addition to the quotation given by counsel, and, as will be seen by a perusal of what follows on pages 87, 88, and 89, it was the opinion of this court that relief can only be had by an appeal to the trial court, whose determination is not subject to review. See *State* v. *Carroll*, 38 Conn. 449 (9 Am. Rep. 409); *State* v. *Noyes*, 87 Wis. 344 (58 N. W. 386, 27 L. R. A. 776, 41 Am. St. Rep. 45).

We are of the opinion that the questions relating to the conduct of the prosecutor before the grand jury, and the rulings upon evidence taken or offered upon the hearing of the third and seventh pleas, and the charge thereon, are covered by this ruling, and it is therefore unnecessary to review the court's action in the premises. Counsel say that these are not "mere irregularities;" but they fail to show that they have anything to do with the jurisdiction of the jury to consider and find indictments. We are aware that in some States irregularities in the proceedings of grand juries are reviewable upon error. That was stated in the *Reigel Case*. Our statute is a complete answer to all such claims, as there said.

(*c*) The next question relating to the indictment involves the sufficiency of the charge. The first count is based upon the statute (3 Comp. Laws, § 11312), which provides:

"Every executive, legislative, or judicial officer who shall corruptly accept any gift or gratuity, or any promise to make any gift, or to do any act beneficial to such officer, under an agreement or with an understanding that his vote, opinion, or judgment shall be given in any particular manner, or upon a particular side of any question, cause, or proceeding which is or may be by law brought before him in his official capacity, or that in such capacity he shall make any particular nomination or appointment, shall forfeit his office, and be forever disqualified to hold any public office, trust, or appointment under the Constitution or laws of this State, and shall be punished by imprisonment in the State prison not more than ten years, or by fine not exceeding five thousand dollars and imprisonment in the county jail not more than one year."

The count states that "one Lant K. Salsbury, he, the said Salsbury, then being a judicial officer, to wit, city attorney of the city of Grand Rapids," committed the offense. It is claimed that such office is not a judicial office, and therefore that the charge cannot be sustained, and that the indictment should, for that reason, have been quashed.

If it should be held that the statute applies only to judicial officers exercising pure judicial functions in the sense that the term is used in the Constitution, this contention should, perhaps, be sustained. There is force, however, in the suggestion that the statute was designed to be comprehensive in its terms and application, and to cover all officers having duties to perform in the three departments of our government, viz., legislative, executive, and judicial; otherwise the statute would have a very limited scope. By the Constitution the legislative power is vested in the senate and house of representatives (article 4, § 1), the executive power in the governor (article 5; § 1), the judicial power in one Supreme Court, circuit courts, probate courts, and justices of the peace and municipal courts (article 6, § 1). Legislative functions are exercised by many other officers,—e. g., supervisors, members of common councils of cities, and village boards. The execution of the laws is confided to many public officers besides the governor, while many besides judges and justices of the peace aid in the administration of justice. It is our opinion that all are included under the provisions of this law, and are subject to its penalties whenever they transgress its provisions. Support is found for this view in the case of *People* v. *Swift*, 59 Mich. 529 (26 N. W. 694), where it was said that the statute is to be applied "to local as well as to State functionaries, the character of whose duties falls within any of those definitions."

The scheme of our government divides all governmental functions into three classes of powers, viz., the legislative, the executive, and the judicial; and the officers who perform these respective functions must be included in the

three classes of officers who exercise these powers. It is difficult to conceive of an officer exercising any of the powers of government not being within one of these classes; and, when an officer cannot be classed with the legislative or judicial, he must come within the executive class, for, in a sense, all officers execute the laws. The case cited shows that the statute is not to be limited in its application to the governor, the State legislature, and the judicial officers enumerated in the Constitution, for it was there held to apply to other—*i. e.*, local—legislative officers. It must apply to all executive officers and to all judicial officers as well. The Constitution provides that the executive power is lodged in the governor; but the statute uses the expression "executive officers." In Bouv. Law Dic. "executive power" is defined to be "authority exercised by that department of government which is charged with the administration or execution of the laws." Again, the author says (page 726), "Executive officers, *including* the president, are required to execute the laws," etc. The comptroller of the treasury is classed as an executive officer. *U. S.* v. *Realty Co.*, 163 U. S. 427 (16 Sup. Ct. 1120, 23 Wash. Law Rep. 33). In the case of *People* v. *Hays*, 4 Cal. 146, the court asks, " What is an executive officer ?". and answers the question as follows:

"He is one in whom resides the power to execute the laws. It will not be pretended that his honor the mayor undertook to execute any law in making the pretended redemption. The record shows, and the finding is, that no such law was passed. The answer is decisive. The mayor could not legislate. If he could, so also could the city treasurer, the street commissioner, or the collector of taxes. They are all executive officers, as well as ministerial. By way of illustration, let us consider how this would operate. Suppose the treasurer should take $20,000 of the public money, and purchase a lot upon his own volition, under the hallucination that it would benefit the corporation; or that the tax collector, thinking that a piece of property was about to be sacrificed, should apply funds collected for taxes to a like purpose; or that the street commissioner, under the impression that it would benefit

the corporation, should undertake to open and grade streets at his own option. We need not go further than to present the propositions to show their absurdity. These are all executive officers."

See, also, Black, Law Dic. "Executive;" *Attorney General* v. *City of Boston*, 142 Mass. 200 (7 N. E. 722).

In the case of *State* v. *Womack*, 4 Wash. 19 (29 Pac. 939), the statute under discussion punished the offer of a bribe to any executive, judicial, or ministerial officer. It was held to apply to a member of the State board of education, for the reason that he was an executive officer. It was said that the term "executive officer" was a comprehensive one, not limited to the officer in whom the constitution vested the executive power, but included the executive department; and it was further said:

"The departments of the government provided for in our State constitution, like most State constitutions, are divided into three general classifications, viz., the executive, judicial, and legislative; and, when an officer is appointed or elected under our system of government, he comes within one of these classes."

In the case of *State* v. *Denny*, 118 Ind. 388 (21 N. E. 252, 4 L. R. A. 79), it was said:

"Judicial power is the power to construe and interpret the Constitution and the laws, and make decrees determining controversies, and is vested in the courts. The executive power is the power to execute the laws, and is vested in the governor of the State, the *administrative officers* of the State, counties, townships, towns, and cities. Then, to which one of these departments does the appointment to office belong?"

In the *Case of Railroad Commissioners*, 15 Neb. 679 (50 N. W. 276), the court said:

"*First.* Would railway commissioners be State executive officers, or would the office of railway commissioner of the State be a State executive office, if created by the legislature? As railway commissioners are at present unknown to the constitution and laws of this State, we take it for granted that the house, in the wording of the

resolution, had reference to those officers as known to the laws of some of our sister States. In looking into the statute of the State of Iowa, for instance, we find a law making it the duty of the governor, by and with the advice and consent of the executive council, to appoint three competent persons (one of whom shall be a civil engineer), who shall constitute a board of railroad commissioners, etc. The act in its several sections provides salaries for these commissioners, to be paid out of the State treasury; that they shall hold their office at the State capitol; and in many provisions makes their duties coextensive with the limits of the State. There can be no doubt, then, that were a commission of this general character provided for by an act of the legislature of this State, and such act contained the same or similar provisions as those contained in the act of the Iowa legislature referred to, such commissioners would be State officers. Whether they would be State executive officers, within the meaning of our constitution, must be determined by an examination of the provisions of that instrument.

"The first clause of article 2 of the constitution is in the following language: 'The powers of the government of this State are divided into three distinct departments,—the legislative, executive, and judicial.' Articles 3 and 4 are devoted to the legislative department, investing its authority in a senate and house of representatives, limiting their powers, apportioning their representation among the several counties of the State, etc. Article 5 is devoted to the executive department, and provides that it 'shall consist of a governor, lieutenant governor, secretary of state, auditor of public accounts, treasurer, superintendent of public instruction, attorney general, and commissioner of public lands and buildings,' etc. Article 6 is devoted to the 'judicial department.' The powers of the State government being thus, by the fundamental law, divided into these three distinct departments, it is clearly incompetent for the legislature to create a commission, and invest it with any official power, without assigning the duties thereof to one or the other of them. The powers and duties of railroad commissioners, as defined by the statute of Iowa above referred to, are inherently executive. Webster, in defining this word, says:

" 'In government, "executive" is distinguished from "legislative" and "judicial;" "legislative" being applied to the organ or organs of government which make the laws, "judicial" to that which in-

terprets and applies the laws, and "executive" to that which carries them into effect.'

"Even were it not inhibited by other clauses of the constitution, we do not think that it is desired or contemplated to invest such railway commission with the power to make laws, or even to interpret or apply them, but that such duties would be to aid in carrying the laws into effect. Hence their duties would be executive, and, if State officers, if paid out of the State treasury, and their field of duty coextensive with the territorial limits of the State, they would be State executive officers."

In this discussion we should not omit the subject of ministerial officers, for it is contended that the city attorney of Grand Rapids belongs to that class, and that such class is distinct and separate from the three classes named in the statute, — *i. e.*, executive, legislative, and judicial officers. Some of the authorities — *e. g.*, the American & English Encyclopedia of Law — divide public officers into the four classes mentioned. See 23 Am. & Eng. Enc. Law (2d Ed.), 325. This is a classification with respect to the nature of their acts or duties; and in 20 Am. & Eng. Enc. Law (2d Ed.), 793, there will be found a definition of what is meant by ministerial acts and duties. Our Constitution has made no mention of ministerial officers in its distribution of the "powers of government." Apparently it was considered sufficient to classify them as executive, legislative, and judicial; and it is natural to say that the officers in whom the respective powers are lodged, and to whom duties are assigned, belong respectively to one or another of these three classes. Accordingly, we say that mayors of cities belong to the executive class, senators and representatives are of the legislative class, while all judges belong to the judicial class.

There is comparatively little difficulty in determining what officers are legislative and what judicial, but when we reach the executive class it is said to be not so easy. We may say that the only executive officer is the governor, because the Constitution vests executive power in the governor; or we may say that all who have functions

in the administration of public affairs, as contradistinguished from legislative and judicial functions, belong to the executive class. That the latter, and not the former, should be the rule, is indicated from the language already quoted from the case of *People* v. *Swift*, 59 Mich. 529 (26 N. W. 694). It is also apparent from article 18, § 1, of the Constitution, and its unvaried application to officers of all grades,— State, county, township, school district, and municipal.

A sharp line of demarkation is suggested, viz., that, though this be the rule; it cannot apply to those officers whose duties are ministerial, *i. e.*, those who are not called upon to exercise a legal discretion, but whose duties are clearly pointed out by law, or by the discretion of a superior officer. Doubtless it would be competent for the legislature to make such an omission from a statute, or a constitution might contain provisions which would indicate the exception of such officers from the executive class, though their acts would be none the less executive in character, rather than legislative or judicial. But our Constitution has not done this. Apparently it was considered best to limit the powers to three, leaving it to be inferred that the officers exercising the powers and performing the duties should be subject to a similar classification.

There is nothing in the fact that an act is ministerial inconsistent with the fact that it is also executive. All these classes of officers may have ministerial duties, but it does not follow that such officers are thereby taken from the respective classes to which their general duties pertain. Nor does it follow that one who cannot be called a legislative or judicial officer cannot be an executive officer, for the mere reason that all of his duties are pointed out by law, leaving him no alternative but obedience. The character of the act does not depend on the amount of discretion confided to the officer. There is much reason for saying that, under our Constitution, all administrative or ministerial duties are executive in character, as they not only can be nothing else under the Constitution, but they

are all acts in the conduct of the government, *i. e.*, the administration of public affairs through and under the regulations prescribed by law. In *State* v. *Loechner*, 65 Neb. 814 (91 N. W. 874, 59 L. R. A. 915), it is indicated that ministerial officers may be treated as "a subdivision of that class of officers which, in a general way, belong to the executive branch of government." The Nebraska opinion says further:

"The constitution of Indiana divides the powers of government into the legislative department, the executive department (including the administrative), and the judicial department. Our constitution recognizes the same general divisions of power, and separates the government into the same departments."

"This court has used the word 'ministerial' as synonymous with the word 'administrative,' and it seems that the two words are so closely allied in meaning that they may be, and frequently are, used interchangeably. An administrative officer is frequently classed as a ministerial officer, and *vice versa*. Anderson's Law Dictionary defines 'administer' to mean 'to dispense, direct the application of; as to administer the law, justice.' Bouvier speaks of administrative as synonymous with 'executive; a ministerial duty; one in which nothing is left to the discretion.'"

See, also, *Attorney General* v. *City of Boston*, 142 Mass. 200 (7 N. E. 722), and the case of *People* v. *Hays*, 4 Cal. 146, already quoted from.

In Black, Law Dic. tit. "Administration," it is said:

"The administration of government means the practical management and direction of the executive department, or of the public machinery or functions, or of the operations of the various organs of the sovereign. The term 'administration' is also conventionally applied to the whole class of public functionaries, or those in charge of the management of the executive department."

Mechem, in his work on Public Officers (section 655), makes the following statement:

"This class of officers is known by different names. They are sometimes called 'executive' officers, sometimes

'administrative,' sometimes 'ministerial,' and with slight shades of distinction; but for convenience sake, and as may properly be done, they will all be treated here under the general head of 'ministerial' officers, and there will be included all officers whose duties are wholly or chiefly ministerial."

It is no unusual thing to find cases where executive officers are called upon to perform acts in their nature judicial. See 1 Bouv. Law Dic. pp. 726, 727; Cooley, Const. Lim. (6th Ed.) pp. 54, 108; *Charleston, etc., Bridge Co.* v. *Kanawha County Court*, 41 W. Va. 663, 671 (24 S. E. 1002),—where it is said, "When it becomes necessary to determine a question of law or fact, the act is judicial."

In the Indiana constitution, article 7 is headed "Judicial," and section 11 of that article is headed "Prosecuting Attorneys." "There shall be elected in each judicial circuit, by the voters thereof, a prosecuting attorney, who shall hold his office for two years." This seems to be all the provision on the subject of whether the prosecuting attorney is a judicial officer. In a bribery case in Indiana it was charged that one Henning, who was prosecuting attorney, accepted a bribe from Becker to induce him to prevent the grand jury from indicting Becker. The indictment, on motion, was quashed, and the State appealed. The court said:

"The turning point in the case is this: Is a prosecuting attorney an officer intrusted with the administration of justice? He is a judicial officer, created by the constitution of the State. 1 Gav. & H. Stat. p. 47, § 11. He is the law officer of the court, to whom are intrusted all prosecutions for felonies and misdemeanors. 2 Gav. & H. Stat. p. 430, chap. 3, § 4. He is legal adviser of the grand jury. We think he is an officer intrusted with the administration of justice." *State* v. *Henning*, 33 Ind. 189.

In the Texas constitution district attorneys were classed as judicial officers. Subsequently the law provided for county attorneys. The supreme court said:

" We have little doubt, had the office of county attorney existed when the act of August 28, 1856, was passed, county attorneys would have been enumerated and classed as judicial officers; and the fact that they are not included in article 1871 makes them none the less judicial officers. By the second article of the constitution of 1869 the powers of the government are divided into executive, legislative, and judicial; and this is but the maxim of all republican states. Upon county attorneys, under the law of 1866, in their respective counties, devolve the duties and responsibilities of district attorneys." *State* v. *Currie*, 35 Tex. 17.

In federal affairs we have a department of justice, under which many lawyers take appointments and perform duties pertaining to the legal affairs of the government; and one of our number suggests that Ontario has its "Minister of Justice."

In the case of *Gleason* v. *Manufacturing Co.*, 1 App. Div. 259 (37 N. Y. Supp. 267), in discussing the use of the word "judicial" as applied to officers, it was said:

"In this class of cases the term 'judicial' is not used in the sense of appertaining to the judiciary or the administration of justice, but as indicating the exercise of discretion or judgment as distinguished from what is purely ministerial."

And in *Friedman* v. *Mathes*, 8 Heisk. 502, the following language is found:

"If an officer do an act depending upon the exercise of the slightest judgment or discretion on his part, then the act is judicial, whatever may be the general functions of the officer."

New York declares attorneys to be judicial officers. See 1 Rev. Stat. N. Y. (8th Ed.) p. 370, and *In re Baum*, (Sup.) 8 N. Y. Supp. 771.

It does not follow, from these authorities, that the classification of an officer is to be determined from the nature of isolated acts or functions, but rather the contrary. We have no doubt that the classification of a prosecuting attorney in Indiana, New York, and Texas is

fixed by the statutory provisions quoted. But, in the absence of such statutes, we are not certain that they should not be classified as executive officers, notwithstanding the fact that certain acts may be judicial; and the same may be said of the city attorney of Grand Rapids; and notwithstanding the fact that there appears to be a sense in which they may be called judicial officers. It matters little, however, which we call it. It is enough that the defendant comes within one or the other of the classes, and it is as obvious that all official acts, whether executive or judicial, are within the terms of the statute. If defendant cannot be called a judicial officer, he must be within the class called "executive;" and, if the act is not a judicial act, but is nevertheless an official act or duty, it is none the less covered by the statute. It is unimportant that the indictment alleges that the defendant is a judicial officer, or that the act was a judicial act. It is explained and corrected, if erroneous, by the statement of his office and act. The law will take notice of the proper classification of the former and the true nature of the latter. We are of the opinion, therefore, that the indictment was valid.

### 2. The Investigation of the Charge of Attempted Bribery.

During the progress of the trial, the prosecuting attorney brought to the attention of the court the fact that he had evidence in his possession of an attempt to bribe a witness for the people with a view to falsifying his testimony or suppressing it altogether; and an investigation of this charge was entered into, the case on trial being temporarily suspended meanwhile. This was strenuously opposed by counsel for the defense, who insisted that it should be deferred until the trial was over. They also urged that a written charge against some person should first be made, and that it must take the form of proceedings for contempt. We should be loth to say either that counsel were not justified in at once calling the attention

of the court to such an attempt, or that the court's discretion in regard to investigation should be in any way interfered with in such a case. It is within his province to take prompt measures to prevent or check it.

The only question that we have before us in relation to this investigation is whether the course taken was improper, in that the rights of the defendant were not sufficiently guarded, whereby he suffered injury. The subject was broached as follows:

"*Mr. Ward:* If your honor please, I will have to ask the court's pardon for delaying the court,—a matter we wish to call the court's attention to. I would suggest, probably, the advisability of having the jury retire.

"*The Court:* The officer may take the jury to the jury-room.

"*Mr. Ward:* Now, if your honor please, a matter has been called to our attention in such a way that we feel we know substantially what we are talking about,—that an attempt has been made during the progress of this trial to bribe one or more of the people's witnesses, and that money has actually been passed to one of these witnesses for the purpose of influencing his testimony in the case; and we ask at this time—I think it is due to the dignity of the court, to the due administration of justice in this case, and to the end that no further attempts be made, either upon the jury or upon witnesses.—that the court may inquire into the matter. We are prepared, or will be in a very short time, to produce the witness, so that your honor may have the means of knowing all that we know in regard to the matter, and may be advised as to what course ought to be taken, and possibly direct the prosecutor the course that he shall take in the matter."

After the jury retired, a long and acrimonious debate occurred between counsel, at least upon the part of counsel for the defense. It is unnecessary to quote it. The court then said:

"*The Court:* The court has listened to all the counsel had to say, because it seems to the court a matter of importance, in which both the rights of the respondent which the law guarantees him should be protected, the rights of the people, the Commonwealth, the dignity of the court,

and the protection of that court in the carrying on of trials before it should be guarded from corruption or abuse. It seems to the court at the present time that there is some force in the suggestion made that, should this hearing go on at this time, whatever might be the result of it, it might perhaps prejudice the rights of the respondent in the case on trial; perhaps wrongfully prejudice them. The court can conceive how a result might be reached in this investigation which would perhaps be unfair to the respondent. On the other hand, the court is bound to see to it that the witnesses brought here on the part of the people are not corrupted. It is the judgment of the court at the present time that, instead of going on with this proceeding at this time,—a proceeding which might possibly consume a good deal of time,—that the prosecutor may place before the court, perhaps also before the judge of this court, what evidence or information he has. The court can then be better advised than at the present time whether it is essential that a proceeding of this nature go on now, or whether the rights of the people and the rights of the respondent can be protected by postponing it to some later time and carrying on the investigation:

"One thing the court does want to say: That this matter will certainly receive investigation, either now or at some other time. The court will not permit in any manner any person, whoever it may be, to interfere with the regular progress of the trial of cases in this court, or interfere in any manner with jurors or witnesses. The court is not assuming, in saying that, that it has been done, but I say, when the charge is brought by an officer of the court in the manner in which it is, the court is bound to take notice of it. I think the judgment of the court is that to-morrow morning, or this afternoon, the prosecuting attorney may place before the judge of this court whatever evidence he has, or indicate to the court what that evidence is, and the nature of it, the extent of this matter; and if it seems to the court that the interests of the public, the people, the integrity of the court proceedings, can be protected by an investigation later on, the court will take that course. If it seems to the court necessary that this investigation go on at this time, the court may so order it.

"*Mr. Morse:* Will you adjourn court until tomorrow morning, under the circumstances? There is only a half an hour now.

"*The Court:* Yes, I think so. The officer may bring in the jury.

"*Mr. Morse:* The court says I can enter an exception there to these proceedings.

"*The Court:* Gentlemen of the jury, I wish to say to you that certain proceedings have been had and discussion had in the court-room this afternoon which are no concern of this jury. The court purposely excluded the jury from the room so that you might have no knowledge of what has taken place here. I want to say to you, further, that the court strictly enjoins upon you and each one of you that you hold no conversation with any person whatsoever in relation to the proceedings this afternoon while you have been excluded from the court-room; and, further, that you do not read in any newspaper the accounts, if they are published, of the occurrences which have been kept from you today. You are to consider in this case, as you already know, under your oaths, only the evidence that you hear from the witnesses; only such evidence as, under the ruling of the court, is permitted to be given in your hearing. More than that you have no right to consider it. And you are strictly enjoined by the court neither to converse with anybody in relation to this case in any of its aspects, nor in relation to what may have been said in this court-room while you were out of it this afternoon. I might add that these commands of the court with relation to the trial of the case are binding upon the jury, and, should any misconduct of the jurymen come to the notice of the court in any respect in which the court has charged you, it would be contempt of court, and would justify the court in imposing a penalty. I say not in the way of warning, or threatening, or anything of that kind, nor that the court thinks that you would disregard any injunction of the court, but simply that you may be fully advised as to what your duties are and what your rights are in this matter. The court will not proceed further this afternoon with the trial of the case. When the court adjourns it will be until the usual hour tomorrow; but I wish each of the jurymen to bear in mind distinctly what the court has stated to you this afternoon."

When court opened the next day, the following occurred:

"*The Court:* The officer will take the jury to the jury-room a moment. In relation to this matter that was brought to the attention of the court yesterday afternoon, since the adjournment of court, the prosecuting attorney

has stated to the judge the matters on which his statement here was based. It seems to the court a matter of very great import, and one that, in the judgment of the court, demands of necessity a prompt investigation. I am inclined to think, however, that the proper procedure, instead of examination of witnesses here in court, which would undoubtedly necessitate a good deal of time, the prosecutor should reduce to affidavits, so far as possible, such proof as is within his possession touching this matter, and present it here to the court. The court will consider it, and take such action as seems to be warranted by the showing made. The court is disposed to either take that course, or to permit the inquiry to be made as was proposed yesterday, in open court. The judgment of the court is that the ordinary practice, the regular practice, perhaps, where an order to show cause is asked for an alleged contempt, is to present the matter to the court by affidavits; and, if the court deems the showing sufficient, to order an order to show cause to issue thereon. The court will not fix the time in which the prosecutor shall present that to the court, but the court will request that it be done at the earliest moment possible, in order that the investigation of this matter, the bringing of it properly and regularly before the court, may not be delayed a moment longer than is absolutely necessary. It may be done this afternoon. If the affidavits or showing cannot be procured at that time, it may be done at the coming in of the court on Monday morning.

"*Mr. Ward:* I suppose it is the purpose to go on with the case this forenoon, then?

"*The Court:* My intention is to go on with the case for this forenoon. I had thought that the case is likely to be of considerable length, and rather a burdensome case; that, perhaps, if we run until Saturday noon, that it will be all that ought to be asked of the counsel and the jury, and not continued during the afternoon of Saturday, and probably resume the case on the afternoon of Monday.

"*Mr. Ward:* We will act upon the suggestion of the court, and do it as quickly as possible. It is possible that the court doesn't wholly comprehend how much work he is asking of the prosecutor in making this suggestion. It should be borne in mind that the prosecutor, of course, has been engaged in this trial, and will be evidently until noon today, with plenty of work to take up every minute of his time, if he could have it, in the preparation of the case to

go on next Monday again. But this request will necessarily require the prosecutor to spend a large amount of time in the preparation of these affidavits. It is not an easy matter to get the witnesses together, nor prepare them. I don't know whether the prosecutor can stand it to work night and day for the next six weeks or not; but I will do the best I can.

"*The Court:* The court did not intend, by requesting it to be done as soon as possible, to ask anything impossible of the prosecutor. Of course, such time as is necessary will be given, whether it is Monday or some other time. The court simply stated that it be done as soon as possible, in view of what seemed to the court the gravity of the matter,—a matter of import; and any investigation of it ought not to be delayed any longer than possible. Of course, it is understood and the court appreciates the duties already devolving upon the prosecutor in the regular conduct of the case, and all the court has to suggest is that it be done as soon as you are able to do it consistent with your other necessary duties. I have suggested this course, as it seemed to the court that the proposed inquiry in open court would be likely to consume perhaps a good deal of time, and present another issue for the court's determination in the middle of the trial of the case, which ought to be avoided, if possible; and it has seemed to the court, so far as there is any precedent for this matter, that the usual, ordinary, and regular way was bringing the matter of this kind to the attention of the court by affidavits. For that reason I have suggested that that course be taken, instead of the one suggested yesterday, or the examination of witnesses in open court. That may come later, if the showing is deemed sufficient by the court to order an investigation and a hearing, which must of necessity be a proceeding in open court. With that understanding, we will proceed with the trial of the case."

"Monday Afternoon, October 28, 1901.

"*Mr. Ward:* We have prepared the affidavits suggested by the court, and pass them up at this time.

"*The Court:* The court has not seen these affidavits, or had time to examine them. They may be filed, and the court will take them up and examine them at the earliest moment possible, and make such ruling as seems to be demanded.

"*Mr. Morse:* Now, I have understood that these affi-

davits, or the substance of them, were to be placed in the hands of newspapers. Of course, the usual proceeding in a case of this kind, from what has been outlined by your honor, you will examine these affidavits; you may arrive at the conclusion that there is not sufficient to issue an order to show cause against anybody, and you may arrive at the conclusion that there is reason for an order to show cause. Usually on proceedings of this kind they are *ex parte*. On an order to show cause, the parties against whom that order to show cause may be directed have nothing to do with the matter until the order to show cause is made. Then comes the answer of the respondent in that particular case, backed by such affidavits as he may care to present. The general rule, as I understand it, in cases of contempt, is that, if the contempt was committed in the presence of the court, it is only necessary for the court to summarily bring the man before the bar of the court; but, if contempt is committed out of court, the usual proceeding is as has been indicated by your honor, and that, when the matter is brought to the attention of the court, and the order to show cause is made, there are two things to be done,—either a denial by the party charged with contempt of having committed any contempt, or an explanation of the circumstances which appeared before him. If he denies the commission of the contempt, then an issue is formed which will be determined by the judge. If he makes an explanation, then it is for the judge to say whether that explanation is sufficient or not. What I suggest is that, in regard to this trial, I don't know against whom these affidavits are directed, except as we have rumor; but, as far as the respondent is concerned, these proceedings, if published before the order to show cause is issued, before the parties charged with this attempt of bribery have a chance to make their denial or their explanation, it certainly has an effect. I have tried a great many criminal cases in my time, and I have tried a great many cases where the air of the court-room was so charged with prejudice that it would be impossible to have my client gain a verdict. I know of at least two cases where, when, after an appeal to the Supreme Court, and a new trial was granted, the prejudice was the other way, and the men were acquitted in five minutes after the jury went out, or fifteen. This matter of prejudice is something that is as subtle and as all-pervading as the air itself. It goes into every corner, nook, and crevice of the

community; and it is impossible to separate it from the jury, even if they should be put in charge of an officer. It seems to me that no good and useful purpose can be served by publishing these affidavits at this time.

"*The Court:* So far as that is concerned, the court probably cannot control the action of the newspapers in publishing anything that is a public record. As the court understands it, these affidavits, being filed, become a part of the records, just as counter affidavits or a showing on the part of any one charged with misconduct. I would say the court had requested the prosecutor to, if possible, prepare the affidavits and submit them to the court before coming in this afternoon, so that I might have an opportunity to examine them, and be ready to announce what action would be taken thereon. A portion of them were prepared and have been examined, but not all. The court has not felt that he cared to act on the matter without examining all of the affidavits.

"I might say in further connection, and inasmuch as counsel for respondent have alluded to it, that it has seemed best to the court at this time to place the jury for the remainder of this case in the custody of an officer or officers of the court, in order that any possibility of influence of any nature coming to them from outside might be averted and prevented, so far as it is possible for the court to do it. Further than that the court is unable to see that it can do anything. The court has undertaken and will undertake, so far as possible, to guard the rights of every person in this case,— the rights of the respondent and the rights of the people. The court will examine these affidavits, and possibly before the adjournment of the court tonight will announce what action will be taken, if any, thereon.

"*Mr. Grove:* I desire to enter upon the record an objection and an exception to the proceedings just taken by the public prosecutor, and the interruption thereby of the proceedings of this trial.

"*The Court:* The officer may bring in the jury."

Thereupon the trial of the case proceeded. We are not advised that anything more was done or said about the matter, and there is nothing to indicate that any member of the jury heard of what occurred after he left the room. It appears that the facts were not stated in detail by counsel, and no affidavit was filed, until after the jury were

placed in charge of the officer. Counsel say that they
must have heard of this during the period which elapsed
between the time when Mr. Ward called attention to the
matter and the order to the officer to take charge of the
jury. We cannot assume that the subject was discussed
by outsiders or others in. the presence of jurors, or that
jurors deliberately violated their oaths or the instructions
of the court. Doubtless the court would have made the
order to confine the jury earlier, had counsel asked it, and
had he considered it necessary. In most cases jurors are
allowed to go at large, unless counsel ask their confine-
ment. Doubtless they sometimes hear discussions and
comments about the case upon trial. At least, there is a
prevailing impression that they do. But the law relies
upon their integrity and obedience, and verdicts are not
lightly set aside for such a reason. Here we not only find
no precautions taken by the defendant's counsel to guard
against this danger, but we have no evidence of any mis-
conduct on the part of any one.

### 2 *a.* The Evidence of Bribery Upon the Trial.

The foregoing discussion leads naturally to the question.
of the admissibility of evidence of the alleged bribery,
which was introduced upon the rebuttal by counsel for
the people. Counsel for the defendant maintain that it
was not competent to show conversations between the
prosecutor's witness Garman and Mr. Nichols, defend-
ant's counsel, or others, relative to the alleged bribery;
while the counsel for the people say that such of the testi-
mony as was introduced by them in the first instance was
admissible, and that the cross-examination and testimony
subsequently offered for defendant opened the door for
the entire transaction. As we understand the record, it
was claimed by the defense that one or more letters were
written by McGarry, and sent to and received by the wit-
ness Garman, and there was some testimony to that effect.
Thereupon counsel for the defense called upon Tessa Dun-
can, McGarry's stenographer, who produced some type-

written papers, which she said were copies of letters dictated by McGarry to her as letters to Mr. Garman, and that they were printed by her and mailed to Garman. It was claimed that one or more of these were copies of letters shown to have been delivered to Garman. Tessa Duncan's testimony was given after the charge of bribery was made. Subsequently counsel for the defense recalled Garman for further cross-examination, and asked him regarding the receipt by him of the original letters of which the papers identified by Miss Duncan were said to be copies. Some of these he denied receiving, and others he was not certain about. On redirect he was asked what the reason was that he was not certain about such letters. His answer was that he "wished to be very careful, because Mr. Nichols had showed him several spurious letters." This was objected to, and counsel for the people said that it was proper testimony, for the reason that "the defense had asked about his being uncertain about these letters, and doubtless wished to make comments upon his want of certainty." The following then occurred:

"*The Court:* It seems to the court that this question, perhaps, might be answered. The court does not intend to change the ruling made the other day in relation to entering into a matter that the court held was not admissible in this case. At the same time the inability of the witness to recognize certain letters and telegrams, I suppose, was put in the case for a purpose.

"*Mr. Nichols:* Put in the case for the purpose of asking if he did recognize them. Of course, if they were introduced afterward, the question might be opened, possibly.

"*Mr. Grove:* I move that that answer be stricken out; highly improper.

"*The Court:* I think the court will allow it to remain, although, as the court now understands the matter, the whole subject is not up for discussion, but possibly as an explanation of his statement that he was unable to recognize certain letters, or his care and caution in the matter. As an explanation of that, the answer so far as given may remain.

"*Mr. Grove:* I take an exception to the ruling of the court.

"*Mr. Ward:* I did not expect to go beyond what the uling indicates. I recognized the ruling of the court.

"*Q.* When and where was that?

"*A.* In New York City.

"*Q.* When?

"*A.* It was on the 8th day of October.

"*Mr. Grove:* Objected to as immaterial. I submit that this is wholly immaterial. He has given the reason.

"*The Court:* Is your objection to the present question?

"*Mr. Grove:* Yes, the last two questions,—when and where it was. He has given his reason for want of recollection. The details of it are not material.

"*The Court:* The details are not material, but the time when and where, it seems to the court, possibly is material, in connection with the other answer given by the witness."

This is as far as the subject was pursued at that time. Apparently these copies had not been offered in evidence at that time, but they were later, when the defense was made. After the defense was closed, testimony in rebuttal was introduced. Garman was recalled, and testified that Exhibit 77, purporting to be a copy of one of these letters from McGarry to himself, had never been received by him. The following then occurred:

"*Q.* I will ask you if you ever, at any time, saw what was claimed to be another copy of that letter?

"*A.* I have seen what was purporting to be a copy.

"*Q.* Where did you see it?

"*A.* In New York, in Mr. Nichols' hands.

"*Q.* When?

"*A.* The 8th day of October.

"*Q.* 1901?

"*A.* 1901.

"*Q.* What kind of paper was the letter or purported copy of letter that Mr. Nichols showed you upon?

"*Mr. McDonald:* I object to that as incompetent, immaterial, and irrelevant.

"*The Court:* The objection is overruled.

"*Mr. McDonald:* An exception.

"*A.* It was on long typewritten paper; the kind that they use on typewriter; not letter paper.

" *Q.* Not cut short, like that for letter purposes?

"*A.* No, sir.

" *Q.* You mean long typewritten paper, the length of a sheet of foolscap?

"*A.* I do.

" *Q.* Legal cap. Were you asked at that time to make any marks or *memoranda* on that purported copy of paper?

"*A.* I was.

" *Mr. McDonald:* Wait a moment. I object to that as incompetent and immaterial.

" *The Court:* The objection is overruled.

" *Mr. McDonald:* An exception.

"*A.* I was.

" *Q.* Did you do it?

"*A.* I did.

" *Q.* At whose request did you do it?

"*A.* Mr. Nichols'.

" *Q.* In what way did you mark it?

"*A.* My initials.

" *Mr. McDonald:* The same objection.

"*A.* Along the side.

" *Q.* Where did you meet Mr. Nichols?

"*A.* 29 Broadway; Mr. Louis A. Richter's office, consul to Bolivia.

" *Q.* Did you have any conversation there with Nichols as to whether that was a copy of the letter?

" *Mr. Nichols:* That is objected to as being incompetent, immaterial, and irrelevant.

" *The Court:* It seems to the court that, the letters having been put in evidence, any inquiry such as proposed by this question would have a bearing on the genuineness of the letter that has already been put in, I understand, by this defense. The court has already ruled that the inquiry may be made, the question answered.

" *Mr. Nichols:* Take an exception.

"*A.* I did.

" *Q.* I wish you would state what was said.

" *Mr. McKnight:* I object to that. Anything that he might have said wouldn't be binding on Mr. Salsbury in any way, shape, or manner.

" *The Court:* It covers the same point, as the court understands it. You may take the answer.

" *Mr. Morse:* Take an exception.

"*A.* I called his attention to the falseness of the letter,

and he admitted it; said it was; but he said it was neces-
sary for his case, and that he must have it, and wanted
me to initial—put my initials on the side of—the letter,
so that I would know that the letter was not changed.

"*Q.* I show you Exhibit 79. Purports to be a letter of
July 26th. Just look at that, and see what it is about,
and see whether a letter purporting to be a copy of that
copy was shown you at the same time.

"*A.* A copy of this letter, as near as I can remember,
was shown me at the same time.

"*Q.* Did you ever receive from Mr. McGarry a letter
such as that purports to be?

"*A.* I never did.

"*Q.* Did you have any conversation with Mr. Nichols
in regard to that letter?

"*Mr. McKnight:* The same objection,—incompetent,
immaterial.

"*The Court:* The same ruling.

"*Mr. McKnight:* An exception.

"*A.* There were quite a number of letters that I had
the same conversation about.

"*Mr. McDonald:* I object to that, and ask to have it
stricken out.

"*The Court:* The answer of the witness may remain.

"*Mr. Morse:* An exception.

"*Q.* As to whether this was one of those letters.

"*A.* It was.

"*Q.* Did you put your initials upon that one also?

"*A.* I did.

"*Q.* As to whether you put your initials on all the
letters that he showed you?

"*A.* I think I did. He read several of them, and had
quite a number of more there, which I didn't read and he
didn't read; but I called his attention that they were
fakes. He admitted it, but wanted me to go ahead and
put my initials on them.

"*Q.* Was there any statement in connection with those
letters prepared by Mr. Nichols for you to sign at that
time?

"*Mr. Nichols:* That is objected to. I don't think that
is competent, relevant, and material.

"*The Court:* The court has admitted this testimony as
bearing on the genuineness of these letters. Unless the
statement had some reference to the letters,—bore on the
same matter,—it would seem to the court to come within

the ruling that the cour* made when this matter was argued before the court.

"*Mr. Ward:* I will waive that at the present time, and I will ask you whether or not, at the time that Mr. Nichols showed you those letters, and got you to put your initials upon those purported copies, any money was offered or paid you by Mr. Nichols to do it.

"*Mr. McKnight:* I object to it as incompetent and immaterial.

"*The Court:* You may take the answer.

"*Mr. McKnight:* An exception.

"*A.* Yes, sir.

"*Q.* Do you say money was paid you?

"*A.* It was.

"*Q.* How much?

"*A.* $500.

"*Q.* What was the talk between you and Mr. Nichols as to what he wanted you to do about it?

"*A.* He wanted —

"*Mr. McKnight:* The same objection.

"*Q.* If anything —

"*Mr. McKnight:* Incompetent and immaterial.

"*The Court:* If it relates to the matter of these letters, it may be received.

"*A.* He wished me to —

"*Mr. McDonald:* Wait a moment; the witness ought to be asked if it relates.

"*Q.* What did he say in relation to the letters?

"*A.* He admitted they were fakes; said they were absolutely necessary to the evidence for the defense, and that he must get them in some way, and he knew no other way to get them in but to have me admit them.

"*Q.* Admit them in court, you mean?

"*A.* Admit them in court.

"*Q.* What did he say—what did he say about wanting you to admit them in court, if anything?

"*A.* Well, that was the reason why he wanted me to initial them, so that I would know that they were not changed; and that they were fakes he admitted, but that they were filled in according to the plan that he had outlined for the defense, and that was as good a plan as he could think of, and that one lie was just as good as another lie.

"*Q.* When you got on the witness stand, what were you to do? Was there any talk about it?

"*A.* I was to admit them.

" *Q.* That is, he desired you to admit them,—swear they were genuine letters; is that the idea ?

"*A.* That was what he wanted me to do.

" *Q.* Was there any talk at that time about Mr. Nichols paying any more money at a future time ?

" *Mr. McKnight:* I object to it as incompetent and immaterial.

" *The Court:* Find out if it had relation to these letters in any way.

" *Q.* I mean consideration,—what he expected you to do in relation to admitting the letters ?

" *Mr. McKnight:* I object to that. There isn't any claim here made for any such purpose.

" *The Court:* You may take the testimony.

" *Mr. McKnight:* An exception.

" *The Court:* The answer to that question.

"*A.* $1,000 more was to be paid, provided I didn't show up, and the trial would be postponed.

" *Mr. Nichols:* I ask to strike that out.

"*The Court:* That apparently had no relation to the letters. It may be stricken out, the last answer.

" *Q.* Then I will ask you if, after you came to Grand Rapids to be a witness here, you had further talks in relation to Mr. Nichols in regard to the same letters.

" *Mr. McKnight:* I object to it.

"*A.* With Mr. Nichols?

" *Mr. McKnight:* Incompetent and immaterial.

" *The Court:* In relation to the letters is the question?

"*Mr. Ward:* Yes.

" *The Court:* You may take the answer.

"*A.* I had a talk with Mr. Nichols about changing my testimony.

" *Mr. Nichols:* That, I ask to strike that out.

" *The Court:* That, I think, may be stricken out.

" *Q.* I will ask you whether, in any of those talks with Mr. Nichols, these letters were mentioned.

"*A.* They were in one talk.

" *Q.* What talk was that ?

"*A.* I think that was on Wednesday morning. I met him at the Morton House. I am not positive in regard to that. He said he wanted to be sure that those letters got in.

" *Q.* At that time was there any talk about your receiving any more money ?

" *Mr. Nichols:* That is objected to as being incompetent.

" *Q.* In connection with your testimony in regard to these letters ?

" *Mr. Nichols:* That is objected to.

" *The Court:* If it is in relation to the letters, the answer may be taken.

" *Mr. Morse:* An exception.

" *Mr. McKnight:* It leaves it in the judgment of the witness.

" *The Court:* The question included that, as I understand it.

"*A.* I was to be paid a larger sum of money.

" *Q.* What sum was talked of ?

" *Mr. Nichols:* That is objected to.   That has been stricken out once.   He hadn't stated it was in relation to these letters.

" *The Court:* Better ask the witness whether it was in relation to these letters or not.

" *Q.* I will ask you whether these letters were included in the talk.

"*A.* Of course, the letters were included in one talk, as I testified.

" *Q.* And these other letters ?   I will ask you whether the other conversation that you had was along the same line, with Mr. Nichols.

"*A.* It was the line of changing my testimony and admitting these letters.

" *Mr. McKnight:* I ask that that be stricken out.

" *The Court:* The portion in relation to the other matter may be stricken out.   The question that was asked, I think, is a general question.   Perhaps it is objectionable on some other ground.

" *Mr. Ward:* I will waive that question.

" *Q.* I will waive the last question, and ask you, after your conversation with Mr. Nichols in New York, and the time that you put your initials upon those letters, when did you next see him ?

"*A.* I saw him at the Morton House on a Wednesday morning after I got here.

" *Q.* How did you happen to see him there ?

" *Mr. McKnight:* Objected to as incompetent and immaterial.

" *Q.* I mean—I presume you mean the same—out of court.   Of course, you saw him here in court.

"*A.* Yes, sir; out of court.

"*Q.* Where did you have any private conversation with him at that time?

"*Mr. McKnight:* I object to that.

"*Mr. Morse:* This whole matter comes under our objection, as I understand it.

"*The Court:* You may take the answer.

"*Mr. Morse:* I do not understand that it is necessary, your honor, to make a separate objection.

"*A.* In the private parlor of the Morton House.

"*Mr. Morse:* Note an exception.

"*Q.* Now, I will ask you how you happened to meet him there. I will ask you if you received any message of any kind.

"*A.* A message was put in my hand.

"*Q.* You say a message was placed in your hands?

"*A.* The night before, at my hotel.

"*Q.* Who delivered the message to you?

"*A.* A man—that I have since learned—whose name is William Leonard.

"*Q.* Did you know him at that time?

"*A.* I did not."

Then followed in detail the alleged circumstances and conversations between the witness and Nichols, including the payment of money to the witness by one said to be an emissary of Nichols, which need not be set forth.

It is claimed by counsel that this testimony was admissible upon the grounds: *First,* as evidence in chief, upon the principle that deceit, falsehood, and attempted subornation tend to show guilt; *second,* as legitimate cross-examination in relation to Garman's uncertainty of the authenticity of said copies. We recognize the rule stated in the first proposition, viz., that evidence that a defendant has attempted to suppress testimony or induce perjury is admissible, and tends to show guilt. Our own cases are in point, and, so far as we know, they are in harmony with the current of authority upon that subject. Moreover, the rule would apply to an attempt made by another at the instigation of a defendant (*People* v.. *Arnold,* 43 Mich. 303 [5 N. W. 385, 38 Am. Rep. 182]); but, before such evidence can be considered, it must be made to

appear that the effort was made at the instigation of the defendant, or with his consent or approval, or at least knowledge or expectation that it had been or would be made. See *Dillin* v. *People*, 8 Mich. 369; *People* v. *Marion*, 29 Mich. 39. If that appears in the case, it is by circumstantial evidence, and it is hardly supposable that it should otherwise appear. The circumstances relied upon may not exclude a reasonable doubt, but that is not the question. It is rather whether they tend to establish such fact.

The circumstances shown were that these things were done on the eve of and during the trial by counsel acting upon the part of the defense; the negotiations were accompanied by the payment to the witness of a large amount of money; the attempt, if successful, would tend to benefit the defendant; conversations had between the witness and Nichols, both in New York and Grand Rapids, about the time mentioned, in which his prospective testimony was talked about, and in which Nichols testified that he made overtures to him (Nichols) regarding his testimony, which were rejected, and counsel not only failed to report the same to the court, but strenuously objected upon the trial to any testimony about such interviews; the improbability of its being done without defendant's sanction; and the further fact, testified to by Mr. Felker, that, about the time of the alleged interviews in Grand Rapids, he saw Leonard about 6 o'clock p. m. on or about October 20th, in the hall in front of the door of defendant's office, talking with some one within the door, whom witness did not see; and that, when he discovered the witness, he made some statement to the person he was talking with, put up his arm (indicating the manner to the jury), and started downstairs. There was no light in the office. Leonard was the man who is said to have carried messages between Nichols and Garman, and who paid the money to Garman. He was seen by Felker at Salsbury's office, as above stated, on the same evening that he delivered the first message to Garman.

Certainly all of these circumstances were admissible as tending to show an attempted bribery by an authorized person. The important question is whether there was any tangible evidence that Nichols' act was in any sense the act of the defendant. It is claimed that the only thing indicating it was the fact that Leonard was seen talking with some one in defendant's office under suspicious circumstances. The court instructed the jury to disregard this proof, unless satisfied of defendant's complicity. We cannot say that the jury disregarded his instruction, or that they found complicity. Should the court have stricken out this evidence, or directed the jury to disregard it, and with it the other evidence upon the subject of bribery, upon the ground that there was nothing in it justifying an inference that defendant was a party to the transaction, or should we say that this testimony was all admissible, and that it was for the jury to find whether Leonard, the go-between, was talking with Salsbury about this matter, and whether the negotiations were with his sanction ? It is unimportant to consider the other ground, or the technical point that the testimony was not rebutting. We are of the opinion that this testimony was admissible, and that it was not error to refuse to strike it out.

### 3. Failure to Prove the Charge as Laid.

Counsel for the defendant insist that there is no evidence to be found in the record which tends to show that the defendant agreed to give the opinion alleged for the sum of $75,000. They say that the testimony all shows that the $75,000 was to be used in whole or in part in corrupting the council, and that the only agreement made by Salsbury, if any, was to endeavor to procure a contract from the city by bribing city officials, and that an agreement to render or give an opinion is not inferable from the circumstances. It is further said that the giving of such opinion would not fall within his duties and powers as city attorney, and that there is no testimony that he gave an opinion as charged, and that, when the opinion was given,

it was after the council had "turned down" the conspirators, and asked for other bids.

The amount of money—$75,000—is laid under a *videlicet* in the indictment, and, under the general rule, it was not necessary that such sum be adhered to in the proof. .Defendant did give an opinion in writing, and it may have been given in compliance with an agreement, although not given until after complications arose, which caused the council to ask for other bids. Again, it is claimed that the evidence shows that such an opinion was given orally, many times, upon inquiry by members of the council, and the statute does not require that such opinion be in writing. Such opinions would be in the line of his duty, and the evidence may have justified the jury in finding that they were so given under such a promise or understanding as is charged, and none the less so because he had undertaken to induce action on the part of the council, if he was shown to have done so. The point cannot be sustained.

### 4. Errors Alleged Upon the Charge.

Many of the alleged errors relating to the charge appear to have been abandoned. Numerous requests were offered by the defendant's counsel, some of which were admittedly covered by the charge, while others were refused. We think it unnecessary to refer to them specifically. Several apply to the credit to be given to co-conspirators and bribers, and to persons who have testified falsely in one particular, or who have offered to change their testimony, etc. The judge covered these subjects fairly in the charge, which was a better practice than to have given the various requests, which contained much of argument, and might have been liable to be misinterpreted, and thought by the jury to have been designed to show a judicial opinion upon the value of such evidence. We have attempted to examine them carefully, and find no error in the refusal of requests. The charge was clear and full, and carefully guarded defendant's interests.

The 325th and 331st assignments, and many others, have been covered by the discussion of other subjects.

### 5. Rulings Upon Evidence and the Remarks of Counsel.

Error is assigned upon the admission of statements of McGarry and Cameron, Taylor, and others, in relation to the transaction. We think that it was proper to submit to the jury the question whether all of these persons and defendant were not co-conspirators, and to admit evidence upon the theory that they were. While admissions, strictly so-called, of a co-conspirator, are not admissible, their acts and conversations are so when a part of the *res gestœ.* We think the testimony complained of in assignment 49, and relating to the codes, letters, telegrams, contracts, etc., was properly received. Whatever was done by any of these persons in furthering the enterprise was admissible upon the theory that they were coconspirators, and there is nothing in the point that such evidence should be limited to transactions in which the conspirators only participated,—a proposition that would seem obvious.

We do not feel called upon to discuss at length the many claims that the remarks of counsel were improper. The suggestion to the jury that defendant did not testify was improper, and was at once admitted to be by him. The court also alluded to it in his charge. There was much said upon the trial calculated to irritate, and provoke strong statements. Apparently counsel for the people endeavored to keep within just and proper rules, and they appear to have evinced as much moderation as could be expected under the sting of repeated accusations of unfairness and unprofessional conduct, in which this record abounds. Under the circumstances, the defendant is in no position to ask that the case be reversed upon the ground of intemperate language used by people's counsel.

The prosecutor is alleged to have had in his possession notes of testimony taken before the grand jury, from

which he put questions to defendant's witnesses, and to have refused to exhibit it to defendant's counsel. It was not necessary to show these notes either to the witness or his counsel. They were not of the character of a deposition or private writing, and therefore not within the rule stated in *Lightfoot* v. *People*, 16 Mich. 507.

One of the grand jurors—being the one who acted as secretary of the jury—was called to impeach one or more of the witnesses as to statements made before such jury, and was examined in the usual way. On cross-examination he was asked to read from the stenographic notes taken by him of proceedings before the grand jury, by which he refreshed his memory, all of the testimony of such witnesses. The court sustained an objection to this. Counsel did not ask to see the stenographic notes and cross-examine upon them, but contented themselves with the claim that the prosecution should allow a copy of all of such minutes to be read to the jury. There can be no doubt of their right to know all that the stenographic minutes contained upon this subject, if they were used to refresh witness' memory; but it was not inquired after; neither is there anything to show that they contained anything inconsistent with the statements made by the writer.

Some other points are made relating to rulings, but it is unnecessary to discuss them further than to say that they furnish no ground for the reversal of the case.

The conviction is affirmed.

The other Justices concurred.