OHIO FARMERS INSURANCE COM-
PANY, a corporation, Plaintiff,

v.

Joseph H. LANDFRIED, a minor, by Ross E. Landfried, his parent and natural guardian, and Ross E. Landfried and Elizabeth R. Landfried, his parents in their own rights, et al., Defendants.

Civ. A. No. 71–967.

United States District Court,
W. D. Pennsylvania.

Sept. 14, 1972.

William R. Tighe, Pittsburgh, Pa., for plaintiff.

Raymond W. Cromer, Pittsburgh, Pa., for Landfrieds.

Robert S. Grigsby, Pittsburgh, Pa., for Federal Laboratories, Inc.

Carl M. Kerchner, Ambridge, Pa., for Borough of Leetsdale.

Raymond G. Hasley, Pittsburgh, Pa., for Michael Poninsky.

Charles Kirshner, Pittsburgh, Pa., for Erie Ins. Exch.

## OPINION

WEIS, District Judge.

The most vigorously contested issue in this declaratory judgment proceeding is whether the word "use" in an automobile liability insurance policy makes the carrier responsible for payment of damages for an incident which occurred within a police car listed in the policy. We hold that under the facts in this case coverage does apply.

The tragedy which led to this litigation occurred on June 10, 1967 when 12 year old Joseph Landfried was seated in the front seat of a police car owned by the Borough of Leetsdale, a municipality in Allegheny County, Pennsylvania. Though there is some conflict in the testimony as to precisely why the boy was in the automobile, it does seem that he was assisting his father in repairing the radio in the vehicle.

Joseph noticed a narrow cylindrical object, which he thought to be a new type of flashlight, hanging by a leather strap from one of the knobs on the dashboard of the car. It was in fact a blast-type billy, a combination weapon which could be used as a truncheon or to fire a teargas projectile. While the boy was inspecting the weapon, it discharged a blast of teargas into his eyes causing blindness.

Joseph's father, Ross Landfried, was a part-time radio repairman and had answered a call earlier in the day from the Leetsdale Police Department to service the unit in the Borough's one and only police car. He and Joseph drove in a pick-up truck to Leetsdale and found the police car parked on the street. Officer Michael Poninsky had been assigned to the patrol car but at that time was on foot engaged in surveillance nearby to apprehend motorists who violated a stop sign.

The repairman was unable to complete the work to the radio at the scene and advised Poninsky that it would be necessary to take the car to the shop located at the Landfried residence a few miles

away. He and Joseph drove away in the car leaving the pick-up truck as transportation for the policeman should it be needed.

Poninsky, like each of the other officers on the Leetsdale force, had been issued a blast-type billy as a part of his police equipment. Each officer was expected to carry this weapon while on duty and take it home with him after his shift was completed. The billy could be fitted into a loop on the officer's uniform but apparently it was not comfortable in this position while the patrolman was driving a car so that Poninsky generally hung it from one of the hooks on the dashboard. The other officers either placed their billy on top of the dash or on the front seat.

Attached to the car in the right front seat area was a bracket in which a shotgun was kept. A locking device prevented unauthorized removal. Additionally, extra ammunition for the officer's pistol and the shotgun was carried in the glove compartment. Teargas cannisters and flares were stored in the trunk.

If Poninsky left the car during his tour of duty, he usually took the billy with him or locked the automobile to prevent anyone from getting possession of the weapon. However, on this particular morning, he had not removed the billy before the repairman drove away and thus the car, together with all of the police equipment, had been taken to the Landfried home where the accident occurred a short time later.

Suits were later brought in the state court on behalf of the boy against the Borough, Officer Poninsky, and Federal Laboratories, Inc., the manufacturer of the billy, who in turn joined Ross Landfried, the father, as an additional defendant. The litigation was settled for a total of $295,000.00 of which Federal's insurance carrier paid $170,000.00, the plaintiff Ohio Farmers Insurance Company paid its comprehensive liability policy limits of $100,000.00 on behalf of the Borough of Leetsdale and Poninsky, and the Borough agreed to pay the remainder of $25,000.00 from its own funds.

The defendant, Erie Insurance Exchange, had issued an automobile liability policy to the Borough of Leetsdale which was in effect at the time of the accident. Erie refused to defend the Borough or Poninsky and did not make any payment toward the settlement on the grounds that the accident was not considered as an occurrence coming within the policy obligation to pay for bodily injuries sustained "by any person . . . arising out of the ownership, maintenance or use of the owned automobile."

The Erie policy is generally in the standard form but the page showing coverage limits shows "use" as "commercial" rather than "business and pleasure". A schedule attached to the policy lists the auto in question as a "Plymouth, 4 Dr. Belvedere (police car)" and also several trucks, street sweepers, fire department equipment, and other vehicles.

Pennsylvania law governs this case but there is a paucity of decisions on point. However, the state Supreme Court in Manufacturers Casualty Ins. Co. v. Goodville Mut. Casualty Co., 403 Pa. 603, 170 A.2d 571 (1961) makes it clear that this jurisdiction has adopted a liberal construction of the phraseology in question. The Court said:

"Construed strictly against the insurer, 'arising out of' means causally connected with, not proximately caused by. 'But for' causation, i. e., a cause and result relationship, is enough to satisfy this provision of the policy."

The opinion also quoted with approval the following language from the case of Suburban Service Bus Co. v. National Mutual Casualty Co., 237 Mo.App. 1128, 183 S.W.2d 376 (1944):

"We find nothing in the policy requiring that the use of the bus shall be the direct and proximate cause of the injury. The words 'arising out of the use of the bus' are much broader than

words such as 'directly and proximately caused by the use of the bus'."

Pennsylvania thus rejects any narrow view that would limit the coverage of an auto policy to injury caused directly and proximately by the vehicle itself.

In this Circuit, the Court of Appeals in Kraus v. Allstate, 379 F.2d 443 (3rd Cir. 1967), applying Pennsylvania law, denied coverage for an incident where the assured, while seated in his auto with his estranged wife, detonated dynamite in a murder-suicide plot. While the fact situation is clearly distinguishable from the case at bar, the Court said in the course of its opinion:

"The murder of Mrs. Depew did not arise within the policy 'use' of the Depew automobile. It had no relationship to the function of the car qua car. There is nothing in the policy evincing any thought of assuming liability for death and injury resulting from an intentional setting off of a dynamite explosion for the purpose of killing the wife of the insured. This was not an incident in the use of that automobile. The latter was not a causative factor."

While the parties have cited a number of cases [1] dealing with situations where guns have been discharged within automobiles with varying coverage rulings, we think that the distinguishing and controlling factor in the case *sub judice*

is that the vehicle was a police car and known to the insurer as such.

It is obvious that the daily and routine utilization of a police car is in quite a different category from that of the ordinary automobile used for business and pleasure.

A police car is used to patrol a community, to engage in high speed chase of criminals, to serve as a roadblock, to provide the mobility necessary for maintaining order, for bringing effective assistance in the event of emergencies such as traffic accidents, violent crime or the other myriad situations which are the daily lot of the police officer. The vehicle's function is not only to transport the person of the policeman but necessarily also the equipment which he may need to carry out his duties.

■ The need for police assistance may arise at any time, without any advance notice or opportunity to return the car to the station for equipment. Hence the "use" of a police car includes its function as a place for the storage of weapons and emergency gear. This is part of its use qua police car.

The mere fact that the billy is described as a personal weapon and issued to each individual officer does not deprive it of its essentially police equipment characteristics nor make its presence in the automobile unexpected or unforeseen.

---

1. *See* Brenner v. Aetna Ins. Co., 8 Ariz. App. 272, 445 P.2d 474 (1968) (no coverage); McDonald v. Great Am. Ins. Co., 224 F.Supp. 369 (R.I.1963) (no coverage under Mass. law which requires proximate causal connection); Cagle v. Playland Amusement Co., 202 So.2d 396 (La.1967) (coverage granted where loaded revolver was used to break window glass in car); Fidelity & Cas. v. Lott, 273 F.2d 500 (5th Cir. 1960) (coverage granted where hunter rested rifle on car and passenger was accidentally shot. Risjord and Austin, in their comprehensive compilation "Automobile Liability Insurance Cases", agree that there should be coverage as a matter of law. Roland H. Long in The Law of Liability Insurance emphatically disagrees); National Farmers Union Property and Cas. Co. v. Gibbons, 338 F.Supp. 430 (D.C. N.D.1972) (applying North Dakota law reaches a contrary result to the *Lott* case in a similar fact situation); Richland Knox Mut. Ins. Co. v. Kallan, 376 F.2d 360 (6th Cir. 1967) (coverage denied when firecracker lighted and exploded inside car). *See also*, Sayre "Coverage Problems Relating to the Policy Terms 'Arising Out of the Use of' and 'Using' a Vehicle", Insurance Counsel Journal, April 1969, page 253.

Other cases cited by Erie have been reviewed but are not persuasive because they apply the law of other states than Pennsylvania and do not deal with the peculiar problem raised by the fact that this was a police car.

**490**

That the vehicle was to serve as a type of mobile arsenal certainly could not come as a surprise to its insurer. Nor can it be said that this function was not reasonably within the contemplation of the parties to the insurance contract.

It is our finding that the act of the police officer in leaving the loaded, dangerous and deceptive weapon in the vehicle when it was delivered to the repairman came within the coverage of the automobile policy.

■ Ohio Farmers made its payment toward the settlement subject to a reservation of a determination of its coverage at a later date. We pass then to consideration of the pertinent provision of the comprehensive liability policy, which it is claimed relieved Ohio of any obligation to pay for the injury.

The form policy contains an exclusion which reads:

"This policy does not apply under Coverage B to the ownership, maintenance, operation, use, loading or unloading of automobiles if the accident occurs away from the premises or ways immediately adjoining."

However, in a letter dated July 12, 1967, addressed to the company's adjuster, the Ohio Farmers' Claims Manager stated that an investigation of the underwriting file revealed that the following additional wording was applicable: "Except with respect to operations performed by independent contractors." The Claims Manager then went on to say: "Under these circumstances, therefore, I actually see no way that we ourselves can exclude coverage for our insured in this accident." We agree that in this situation, since the accident occurred away from the premises, during the course of operations performed by an independent contractor that Ohio Farmers owed coverage.

The Borough is the named insured in both policies and Officer Poninsky is clearly an omnibus insured under Erie's automobile insurance policy. His status under the Ohio Farmers general liability policy, however, is not quite as clear.

The Ohio Farmers' definition of "insured" is as follows:

"The unqualified word 'insured' includes the named insured and also includes (1) under coverages B and D any executive officer, director or stockholder thereof while acting within the scope of his duties as such, and any organization or proprietor with respect to real estate management for the named insured, and if the named insured is a partnership, the unqualified word 'insured' also includes any partner therein but only with respect to his liability as such . . ."

Since the policy is written with a municipality as the "insured", but the language in the standard form used here is more easily applied to business organizations, there is some difficulty in determining those who are 'insureds'. However, we note that in the schedule of hazards attached to the policy, after a listing of various Borough activities, there is a listing "policeman" and a separate charge is made for this coverage.

■ In view of the question of the applicability of the form language to a municipality and the fact that a separate premium was charged for activities relating to "policeman", we think it a fair construction of the contract and the intention of the parties that Poninsky was also covered. Since Poninsky was alleged to be negligent in the course of his duties as a policeman and that the Borough specifically contracted for such coverage, it would be inconsistent with the general plan of protection provided to hold that the officer was excluded and thus personally liable over to the insurance company.

We thus have a situation where Poninsky and the Borough are covered by both the Erie and Ohio Farmers' policy.

■ Each policy contains a provision that in the event of "other insurance" available to the insured for a loss, "the company shall not be liable under this

policy for a greater proportion of such loss than the applicable limits of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss." The policies, therefore, are concurrent and each will share equally in the loss since in this instance both companies have limits of $100,000.00 applicable to the Landfried claim.

Since the question of damages was reserved for determination after the coverage issues were resolved, the case will be placed on the trial list for final adjudication. At that time the Court will pass upon the reasonableness of the settlement and cost of defense.