Appeal by defendant Louise P. Pullen, as administratrix, from an adverse judgment rendered in a declaratory judgment action brought by plaintiff Cincinnati Insurance Company and in which State Farm Fire and Casualty Company is intervenor. We affirm in part, reverse in part, and remand.
In December 1975 Cincinnati issued a policy of insurance to the City of Homewood for a three-year period. This policy was a "Comprehensive Property and Casualty Insurance Policy."
In January 1976 Cincinnati issued a policy of insurance to the Homewood Board of Education, also for a three-year period. This policy contained "Owners', Landlords' and Tenants' Liability Insurance."
Both policies contained the same definition of the persons insured:
 Each of the following is an insured under the insurance to the extent set forth below:
. . . . *Page 395 
 (c) If the named insured is designated in the declarations as other than an individual, partnership, or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such;
. . . .
Each policy also provided that Cincinnati agreed to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay . . . [and] to defend any suits against the insured."
Earl B. Lawley, a resident of Homewood, was employed by the Homewood Board of Education on June 8, 1970, and on November 14, 1978 he was the building supervisor, or engineer, for Homewood High School. His position also required him to be on call for service at four other Homewood schools. He was responsible for the maintenance and upkeep of the football stadium located at West Homewood, and he also was construction consultant to the Board of Education. In his capacity as building engineer at Homewood High School, Lawley was supervisor of the maintenance staff at that school building and had management responsibility over the maintenance staffs of the other schools. Lawley apparently had authority to enter into contracts with others for the Board in connection with his maintenance responsibilities, and in emergency situations he was allowed to act for the Board. On some occasions he attended Board meetings to give information involving building contracts and architectural services.
In addition to Lawley's functions as building superintendent, his duties for the Board also included the security of property and persons in and about the Homewood school system. Thus he had directed traffic on occasion, and sometimes aided in resolving security problems with persons coming onto school property without authority. The record discloses instances in which Lawley performed security and maintenance duties on South Lakeshore Drive, a public road leading to Homewood High School (the only road leading to the school) and which were, in fact, off of school property.
The record also establishes that shortly after the school building was occupied in January 1973 the principal of Homewood High School called upon the City of Homewood to provide security for the school property and for the safety of the school-children. According to the then principal, Mr. Gross, the city officials considered the school property to be private property outside the city limits and, therefore, did not provide the needed protection. Gross and Lawley subsequently visited the mayor of Homewood and its chief of police. As a result of this visit Gross and Lawley were issued a badge and an ID card which identified each of them as a special policeman for the City of Homewood. The school purchased handcuffs for them, and the Homewood Police Department issued them traffic accident report forms to be used in connection with investigations of accidents on or near the school premises.
Mr. Gross left the position of principal of Homewood High School during 1978 to become Superintendent of Education for the City Board of Education. At the time he departed he possessed a pistol which he had kept, for security, in a desk drawer at the school. When he cleaned out his desk upon his departure he asked Lawley to keep the weapon for him.
On November 14, 1978, Lawley arrived at Homewood High School at approximately 6:55 a.m. Shortly thereafter a guidance counselor at the school, Mrs. Charlotte Gibson, requested him to check on a person down on South Lakeshore Drive who was acting strangely. At that time teachers and school children were proceeding to school via that road. Lawley went out the road in a pickup truck assigned to him by the Homewood Board of Education and which bore a municipal license plate, a truck which normally he took to and from work. When he arrived at a point approximately one hundred yards from the school property, in an area used as an access to the school, Lawley came upon a young man walking in small circles in the middle of the *Page 396 
road. Traffic continued on by leaving the roadway. Lawley pulled up beside the man, rolled his door window down, and asked if he could help him. Hearing no reply, Lawley asked for identification, and the young man then, in return, asked for Lawley's identification. At that point the young man was about one or two feet from the truck and was standing still. Lawley showed him his badge, and when the other had stated that it wasn't good enough, Lawley handed him his ID card. The man looked it over and handed it back to Lawley, stating that it wasn't good enough either. According to Lawley, as he was placing his card into his wallet the young man struck him on the side of his face with his fist. Lawley then leaned over to get a pair of handcuffs from the glove compartment as the young man continued to strike at him and attempted to open the truck's door. The pistol (turned over to him by Gross) was at that time lying on the seat. Lawley opened the door on the driver's side and got out of the truck, holding the pistol in his right hand and the handcuffs in his left, being struck in the chest as he got out. Lawley asked the man to place his hands on the side of the truck, but his assailant grabbed the hand with the handcuffs and was pulling on it. Using the pistol in club fashion, Lawley made a striking motion toward the man. The pistol went off. The other man, Stephen T. Pullen, said he had been shot, stopped fighting, and with Lawley's help went to the side of the road where he sat down. A short time later he was taken to a hospital where he died.
This action by Cincinnati sought a determination of liability coverage questions and an injunction against Louise P. Pullen from continuing a wrongful death action she had filed against Lawley, the City of Homewood, and the Homewood Board of Education. The trial court entered no order on that aspect of those proceedings because the parties agreed not to pursue it pending resolution of the coverage questions. State Farm was allowed to intervene in order to determine whether Lawley was entitled to coverage under a homeowners policy issued to him by State Farm.
Following a hearing the trial court rendered a judgment in which it found no coverage to exist under either of the policies. Under the Cincinnati policies, the court found that Lawley did not qualify as an "insured" and that the "occurrence" made the basis of the wrongful death action did not take place in connection with "insured premises" as defined by one of those policies. The court found that no coverage was afforded under State Farm's homeowners policy (1) because of a failure to provide notice, and (2) because the event arose out of a business pursuit and thus was excluded under the terms of that policy.
The paramount issues are, therefore, whether Lawley was an "insured" and whether the shooting incident was an "occurrence" in connection with "insured premises," under the Cincinnati policies; and, under State Farm's homeowners policy, whether the shooting incident arose out of a business pursuit and was therefore excluded, and if not, whether there was a failure of notice to the company as required by the policy.
 I.
Was the "occurrence" in connection with the "insured premises"? That term is defined in the policy:
 "insured premises" means (1) the premises designated in the declarations, . . . and includes the ways immediately adjoining such premises on land.
The testimony amply establishes that the way on which the incident occurred was one immediately adjoining the school premises. Both Lawley and Gross testified to that fact. The point on South Lakeshore Drive where it took place was variously described as being within a hundred yards of the ground owned by the high school and about two tenths of a mile from a chain link fence located 50 to 60 feet west of the actual boundary line. Gross and Lawley testified to the "connection" of Lawley's presence there:
[From Mr. Lawley's testimony:] *Page 397 
 Q Were you in about your employment at the time you went out to investigate this occurrence?
A Yes, sir.
 Q Was that part of your duties and responsibilities as an employee of the City Board of Education?
A As I understood them, yes, sir.
[From Mr. Gross's testimony:]
 Q And, certainly in the performance of his duties on that morning as you understood it, Mr. Lawley was carrying out his duties as an employee of Homewood —
MR. ELLIS: I object. Calls for a conclusion.
THE COURT: He can ask if he knows.
Q Was he not?
A Yes.
Q He was about his business for the City at the time?
A Yes.
MR. SCOTT: We object to the words City —
 MR. ELLIOTT: City Board of Education. I'm sorry. I did not mean City.
A Yes.
Cincinnati insists that the altercation did not occur in connection with school operations or incidental to them, citing Lawley's testimony that he "approached him as a human to another human to see, may I help you.
Lawley's entire testimony on this point was:
 Q All right, sir. When the lady stopped, it was just a teacher there that stopped and said something to you about it?
A Yes, sir, a counselor.
 Q And, that was inside the gate, was it not, of the high school?
A Right near the school, yes, sir.
 Q All right, sir. And, all she said to you, there is a fellow down the road acting strangely?
 A That I should go check on it or something to that effect.
 Q That you should go. Are you commonly required in your job to follow the instructions of teachers?
A No, sir.
Q You can do it or not do it?
A I suppose so. I never thought about it that way.
 Q But, when she indicated that this fellow was down the road, she didn't indicate he was on any school property; did she?
A No, sir.
 Q And, you, thinking in mind who she was talking about, you knew he wasn't on school property; didn't you?
 A No, sir. I didn't know he was not on school property. In fact, I didn't know he was not on school property legally or technically until about three or four months ago when he had the property surveyed and I determined where the school lines were.
 Q Did you think the property of the Homewood High School covered every inch of South Lakeshore Drive?
 A No, sir, I knew it did not, but I didn't go out to do anything to the man. I went to help a person I thought was in trouble.
. . . .
 Q All right, sir. And, when you went down there and stopped, the first thing you said to the fellow — he's standing in the middle of the road?
 A He's not standing. He's doing small circles in the middle of the street.
Q Is he bothering anybody?
A No, sir.
Q Is he stopping anybody?
A He's not stopping. He's hindering traffic.
Q He's hindering traffic?
A Flow of traffic.
 Q All right, sir. When you stopped then with him hindering the traffic on South Lakeshore Drive but when you say he's hindering traffic, do you mean he was creating some kind of hazard out there? A He's causing traffic to slow and leave the roadway. Now, is that a hazard or not?
 Q I'm asking what you thought about it. Did you think he was? *Page 398 
 A I thought he was causing traffic to slow and leave the roadway. I didn't classify —
 Q Did you think he was endangering any teachers or students coming onto the property?
A At what point?
Q At the time you pulled up and saw him?
A No, sir.
 Q So, when you stopped there, all you said was, can I help you; right?
 A May I help you or can I help you or words to that effect.
 Q You never did say to that man, I'm a police officer and you are not supposed to be in the middle of the road?
A I didn't approach him as a police officer.
Q All right, sir.
 A I approached him as a human to another human to see, may I help you.
 Q Would that be true the whole time you were out there, please, sir, that you were just out there as one human to another?
A That was the basic reason for going, yes, sir.
 Q All right, sir. And, you didn't go out there to arrest him?
A No, sir.
Based upon the scope of Lawley's responsibilities as the record establishes them, together with the testimony of Superintendent Gross and Lawley himself, the evidence clearly establishes that Lawley was upon a way immediately adjoining the insured premises and was "in connection" with those premises. Indeed, the mere fact that Lawley's setting out to investigate the counselor's report was accompanied by humanitarian motives did not mitigate his actual authority given to him by the school board or otherwise indicate a lack of accompanying concern for school security.
 II.
Was Lawley an "insured" under the insurance policy issued by Cincinnati to the Homewood Board of Education?
As shown earlier, each policy defined the "insured" as ". . . the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such; . . ." Thus, insofar as individual insureds are concerned, Cincinnati insists that only executive officers, directors, and stockholders are granted coverage by that language.
Cincinnati urges upon us the terms of Code of 1975, §§16-11-5 and -6 and 16-12-3, which provide for the election of city school board members and officers. Under those statutes the offices of president, vice-president and treasurer are provided for, and the city board is required to appoint a city superintendent who "shall be the chief executive officer" of the board. The existence of these provisions, however, does not satisfy questions concerning the application of the coverage provisions to these facts. The insuring clause applies only to executive officers, i.e., the superintendent, an official referred to in § 16-12-3. Those statutes do not authorize the appointment or election of directors or stockholders. Under Cincinnati's argument, therefore, only the city superintendent is an insured under the policy.
We cannot approve such a hypertechnical interpretation. SeeAlabama Farm Bureau Mutual Casualty Ins. Co. v. Presley, Ala.Civ.App., 384 So.2d 122 (1980). It is apparent that Cincinnati has utilized a description of the "insured" which is appropriate to the common corporate organization, but which is not appropriate to the usual form of an Alabama school board. The terms of the definition of "insured" obviously denote an intention to extend coverage to the school board, and, in addition, to those who hold executive and managerial positions. This position is in accord with that taken by this Court inWolsey v. Aetna Casualty and Surety Co., Ala., 346 So.2d 952,953 (1977), which involved the application of the same definition of persons insured as this policy. In Wolsey we held that a foreman who was also a welder, paid by the hour, having no authority to make policy or contracts on his commercial company's *Page 399 
behalf, was not an "executive officer" under the meaning of that term of the policy. Lawley's office under the school board is quite different, however. Lawley, a salaried employee, filled a position created by resolution of the board, possessed managerial discretion and authority over employees in several schools, had duties ranging beyond engineering maintenance, possessed authority to modify contract terms, was involved to some extent in furnishing information used by the school board in shaping construction policies, and in emergencies had authority to alter specified school policies. His relationship with the school board clearly placed him within the class of persons to whom coverage was extended. See Annot. 39 A.L.R.3d 1434. Accordingly, the trial court was palpably wrong when it found that Lawley was not an insured and that the occurrence did not take place in connection with the premises of insured (school).
 III.
Was Lawley an "insured" under the insurance policy issued by Cincinnati to the City of Homewood?
The contention that Lawley was an "insured" under Cincinnati's policy issued to Homewood arises from the undisputed fact that he was appointed a special police officer by the mayor and chief of police, and given an identification card and badge so designating him. The ID card bore his photograph, his signature, and the signatures of the mayor and chief of police. Beginning at the top of this card large print stated:
 CITY OF HOMEWOOD ALABAMA DEPARTMENT OF POLICE [typed] Earl B. Lawley IS A SPECIAL POLICE OFFICER
The reverse side of this card contained a description of Lawley's physical characteristics and his thumbprints. The metal badge bore an imprint of the Alabama state seal. Above the seal were the prominently imprinted words "SPECIAL POLICE" and below the seal, also prominently imprinted, were the words "HOMEWOOD, ALA." The record discloses that these indicia of position were almost identical to those furnished to regular police officers.
The threshold question here is whether any police officer is an insured under this definition:
 If the named insured is designated in the declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such.
Again, we must take note that this policy language is more appropriate to a commercial enterprise than to a municipal corporation, and so we are required to construe it according to the intentions of the contracting parties, Smith v. KennesawLife and Accident Ins. Co., 284 Ala. 12, 221 So.2d 372 (1969), giving it a rational and practical construction. Alabama FarmBureau Mutual Casualty Ins. Co. v. Preston, 287 Ala. 493,253 So.2d 4 (1971).
A police officer has been found to be covered in some jurisdictions. In Ohio Farmers Ins. Co. v. Langfried,348 F. Supp. 486 (1972) a general liability policy issued to a municipality defined "insured" as: ". . . [t]he named insured and . . . any executive officer, director or stockholder thereof while acting within the scope of his duties as such. . . ." That court recognized the difficulty in determining the "insureds" because, as in the case before us, the standard language form was more easily applied to businesses than to municipalities. In construing it, therefore, the court looked to the fact that the hazard schedule listed "policemen," and a separate charge was made for that hazard. This fact was used by the court to establish the parties' intention to include police officers within the definition of "insured" persons.
Another approach was used in Bouis v. Employers LiabilityAssurance Corp., La., 160 So.2d 36 (1963). That case held that a *Page 400 
chief of police was an "executive officer of the named insured." The court cited Black's Law Dictionary, 4th Ed., for the definition of an "Executive Officer":
 "An officer of the executive department of government; one in whom resides the power to execute the laws; one whose duties are to cause the laws to be executed and obeyed. People v. Salsbury, 134 Mich. 537, 96 N.W. [936] 939; Petterson v. State, Tex.Cr.App., 58 S.W. 100; Mekota v. State Board of Equalization and Assessment, [146] Neb. [370], 19 N.W.2d 633, 640. An administrative officer. Sheeley v. People, 54 Colo. 136, 129 P. 201, 203."
In the Salsbury case, the official in question was a city attorney; he was found to be within the classification of an "executive, legislative or judicial officer." In Petterson, a boat pilot appointed by the governor, was held not to be an "executive officer." And in Mekota, a proposed legislative act creating a Department of Industrial Development was held to have proposed an executive state office whose officers had the duty "to cause the laws to be executed; such as the president, the governor of a state, or the chief executive officer of a city." And in Sheely, a county commissioner was held to be a "ministerial officer" within a bribery statute.
Black's Law Dictionary also included the following definition of an "Executive Officer":
 "One who assumes command or control and directs course of business, or some part thereof, and who outlines duties and directs work of subordinate employees. Arkansas Amusement Corporation v. Kempner, 182 Ark. 897, 33 S.W.2d 42, 43."
Kempner concerned an employment agreement by which one was to work as a "Vice President" or in some other "executive capacity."
Bouis, supra, cited a number of Louisiana decisions in support of the proposition that a police officer, being a public officer charged with exercising sovereign power, was an "executive officer." That conclusion was dicta in Bouis, however, because the chief of police was clearly occupying a position at a managerial level, causing the laws to be executed by his direction of others; he was a person in whom was vested the power to direct the execution of the duties of his subordinates. Insofar as the decisions relied upon by the Bouis
court purport to authoritatively establish the proposition that a chief of police and a police officer stand as one under the definition of an executive officer, we are not persuaded that such construction coincides with the practical meaning of the term.
The conclusion reached in Holm v. Mutual Service Cas. Ins.Co., Minn., 261 N.W.2d 598 (1977) is the reasonable one according with the intention of the parties. In that case the insurance company had issued a general liability and automobile liability policy to a municipality. Like Langfried and the instant case, the policy was written in corporate form, and the other persons insured included "any executive officer" of the named insured. The plaintiff Holm sued one Converse, a policeman for the municipality, to recover for injuries he allegedly incurred when Converse arrested Holm. In due course Holm proceeded against the insurance company. In determining that Converse was not covered by the policy the Wisconsin court rejected the argument that the policeman was an executive officer, and also refused to adopt the reasoning of Langfried
which utilized the hazard schedule in ascertaining the intentions of the parties. Citing other decisions which had construed "executive officer" in connection with insurance policies covering private corporations, it recognized that the term "executive officer"
 implies some sort of managerial responsibility for the affairs of the corporation generally and it imparts a close connection with the board of directors and high officers of the company [quoting Wisdom, J. in Bruce v. Travelers Insurance Co., 266 F.2d 784 (5 Cir. 1959)].
The court added:
 In each of these cases, "executive officer" status in a private corporation turned on both the nature of the responsibility *Page 401 
assumed by an individual and his formal designation as a company officer, either in the documents of incorporation or by someone authorized to create official positions. We believe that by identifying persons with similar responsibilities in municipal corporations, reasonable content can be given to the term "executive officer" as it applies to municipal corporations. Reasoning by analogy, then, a general definition might be framed as follows:
 For the purpose of ascertaining the scope of coverage provided by a general liability policy covering a municipality, the executive officers of the municipal corporation are those persons whose position, power, and duties are established in the municipal charter and who are responsible for high-level governmental policymaking. Although somewhat broadly drawn, this definition would generally include a city's mayor or manager, councilmen, administrative board members, and department heads, while excluding employees whose duties are largely ministerial.
 Considering the facts of the present case in light of this definition, we are convinced that Officer Converse was never an executive officer of the [municipality]. While it is true that police officers do exercise quite substantial discretion in the course of their daily law enforcement activities, the decision-making responsibilities incumbent upon them are not of the character contemplated by the definition of "executive officer." That is, a policeman's discretionary actions are not managerial or policy oriented, and are generally only short term in nature.
This analysis is similar to that we earlier expressed in finding that Lawley was an "executive officer" under the insurance policy issued to the board of education. In other words, the reasons which lead to the conclusion that Lawley was not an "executive officer" of the City of Homewood are the very reasons why he was an "executive officer" of the board of education, given the nature of his position, the manner of its creation, the type and extent of his responsibilities, and his relationship with the board of education as a de facto
department head at least.
Declining to follow Langfried in using the hazard schedule as an indication of persons to be covered, Holm continued:
 [A] hazard schedule is nothing more than a list of the potentially liability-producing activities for which coverage is provided to the named insured. An assessment of the number and character of such activities aids the insurance company in establishing the proper total premium charge. Clearly, however, the hazard schedule does not expand the category of persons insured; such persons are specifically designated in a different section of the policy. Instead, a hazard schedule merely lists the risks against which the persons insured are protected, and also sets forth the premium charge associated with each such risk.
That position appears to represent the majority view. See,e.g., MacLellan v. Liberty Mutual Ins. Co., 346 Mass. 415,193 N.E.2d 577 (1963).
For the same reason we cannot agree with plaintiff that Lawley was an insured under the declarations of the City's policy, viz.:
 IN CONSIDERATION OF THE PROVISIONS AND STIPULATIONS HEREIN OR ADDED HERETO AND OF the premium above specified, this Company . . . does insure the insured named above and legal representatives. . . .
Plaintiff's theory here is that at the time of the occurrence Lawley was acting as an agent or representative of the City of Homewood and thus was an insured under the City's policy.
The term "legal representatives" has been construed by this Court as having a particular meaning:
 The term "legal representative" is one having a well-defined legal meaning, its "primary meaning" being executors or administrators. [Citations omitted] . . . This primary meaning would, of course, yield to a context which clearly showed a *Page 402 
different meaning was intended. [Sullivan v. Louisville N.R. Co., 128 Ala. 77, 30 So. 528, 534
(1901).]
We have established that Lawley was not an insured under the City of Homewood's policy because, had he been acting as a policeman for the municipality, he was not covered as such. On the record that is the only capacity on which he could have been acting for the City. In Boston Marine Ins. Co. v. Scales,101 Tenn. 628, 49 S.W. 743 (1899), a fire insurance policy provided that the term "insured" would be held to include the "legal representatives" of the assured. That court held that the term meant "parties beneficially interested, by law or contract, in the policy, such as an assignee, or the executors, administrators, and heirs of the assured, and not persons who are merely agents of the insured." We find nothing in this record to suggest that an interpretation of this term in the declarations different from its usual meaning was intended by the parties.
 IV.
Did the occurrence arise out of a business pursuit excluded under State Farm's homeowners policy?
The trial court found that the event (the shooting incident) arose out of a business pursuit and was thus excluded under State Farm's policy. That finding is amply supported by the evidence we have recited, and because that issue was one of fact the ore tenus rule requires affirmance. EmployersInsurance Co. of Alabama v. Lewallen, 293 Ala. 574,307 So.2d 689 (1975). In Stanley v. American Fire and Casualty Company, Ala., 361 So.2d 1030 (1978), we quoted from Crane v. State Farmand Cas. Co., 14 Cal.App.3d 727, 92 Cal.Rptr. 621: ". . . [b]usiness pursuit . . . more accurately denotes a continued, extended or prolonged course of business or occupation." The record establishes Lawley's broad responsibilities for school security and justifies the finding that at the time of the shooting he was engaged in that pursuit, his usual and continued occupation. That fact being established, the exclusion in State Farm's policy was applicable:
 1. COVERAGE L — PERSONAL LIABILITY and COVERAGE M — MEDICAL PAYMENTS TO OTHERS do not apply to:
. . . .
 (b) bodily injury or property damage arising out of business pursuit of any insured. . . .
It follows that the trial court was correct in declaring that no coverage existed under the State Farm policy.
For the foregoing reasons, that portion of the order of the trial court holding that no coverage was afforded Lawley under Cincinnati's policy of insurance issued to the City of Homewood or under State Farm's homeowners policy issued to Lawley, is affirmed. That portion of the order holding that no coverage was afforded to Lawley under Cincinnati's policy issued to the Homewood City Board of Education is reversed, and this cause is remanded to that court.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur.